191 N.J. Super. 202 (1983)
465 A.2d 953
DAIRY STORES, INC., T/A KRAUSZER'S FOOD STORES, PLAINTIFF,
v.
SENTINEL PUBLISHING CO., INC., PATERSON CLINICAL LABORATORY, INC., AND KATHLEEN DZIELAK, DEFENDANTS.
Superior Court of New Jersey, Law Division Middlesex County.
July 21, 1983.
*205 Jay J. Rice, appearing for plaintiff (Ravin, Davis & Sweet, attorneys).
Douglas G. Sanborn, appearing for defendants, Sentinel and Dzielak (Jamieson, McCardell, Moore, Peskin & Spicer, attorneys).
*206 Norbert T. Knapp, appearing for defendant, Paterson Clinical Laboratory, Inc. (Luongo & Catlett and Robert J. Lecky, attorneys).
SKILLMAN, J.S.C.
This defamation action raises substantial issues concerning the applicability of the "actual malice" standard of liability of New York Times v. Sullivan to the publisher of a derogatory newspaper article about a commercial product and to the laboratory which tested the product and provided the derogatory information.
The alleged defamatory statements were contained in three articles published in two central New Jersey newspapers called "The Sentinel" and "The Suburban" during the 1981 water shortage. The owner of the newspapers is defendant Sentinel Publishing Company (Sentinel) and the author of the articles was one of its reporters, defendant, Kathleen Dzielak. The theme of the first article, which appeared under the headline "Water Sales Booming," was that bottled water companies were enjoying heavy sales while the State was rationing tap water. The theme of the second article, published under the headline "Firms Protect Sources," was that sellers of bottled water were reluctant to disclose their sources of supply. It said this fact "became evident following attempts to discover the name of the spring which supplies the water for Covered Bridge, a product sold at local Krauszer's stores." The primary focus of the claims of plaintiff, Dairy Stores, Inc., t/a Krauszer's Food Stores (Krauszer's), is the third article. Published under a banner headline, "Spring Water/Lab Analysis Casts Doubt on Content," the initial paragraphs of the article read as follows:
A sample bottle of "Covered Bridge Crystal Clear Spring Water," sold at Krauszer's convenience food stores, does not contain pure spring water, according to a laboratory analysis obtained by the Sentinel Newspapers.
Tests conducted on the product, purchased at Krauszer's store at 23 N. Main St., Milltown, showed a chlorine content of .1 parts per million. Ralph Pugliese, *207 director of the state-certified Paterson Clinical Lab, which conducted the tests, said pure spring water should not contain any chlorine.
"I can't see how it could possibly be spring water unless the spring source was contaminated and chlorine was added at the source. Since we thought we were dealing with a spring water sampling, when we received a .1 reading we ran the test again four or five times and had two chemists look at it to make sure."
The article went on to say that a national sales manager for Krauszer's, when informed of the lab results, "insisted that no chlorine is added to Covered Bridge water at any step of the operation and that the water does come from a spring."
After the publication of the articles, Krauszer's asked for a retraction. This was refused. Krauszer's then filed this suit. Named as defendants are not only Sentinel and its reporter, Dzielak, but also Paterson Clinical Laboratories, Inc. (Paterson), which told Dzielak the water contained chlorine and hence could not be uncontaminated spring water. The claims against Sentinel and Dzielak are for defamation. The claim against Paterson is for negligence although, as discussed later in the opinion, it should be treated as a claim for defamation and/or for product disparagement. The case is before the court on motions for summary judgment filed on behalf of all defendants.

I
The threshold issue in every defamation action is whether the language in question is reasonably susceptible of a defamatory meaning. Lawrence v. Bauer Pub. & Print., Ltd., 89 N.J. 451, 455 (1982); Kotlikoff v. The Community News, 89 N.J. 62, 67 (1982). A defamatory meaning will be found only if the language asserts or implies a statement of fact which is damaging to reputation. Kotlikoff v. The Community News, supra, 89 N.J. at 68-70. And liability may be imposed only if the statement of fact is shown to be false. Ibid.
The Sentinel series contains at least one statement of fact which is reasonably susceptible of a defamatory meaning  that is, that a laboratory analysis had shown Krauszer's bottled water not to be spring water. This is clearly a statement of *208 fact. Moreover, it is reasonably susceptible to a meaning harmful to Krauszer's reputation; indeed, it is difficult to perceive any reasonable non-defamatory interpretation which can be given to the statement. And the fact that the article purports to report upon a test analysis conducted by a third party, Paterson, does not prevent Krauszer's from asserting claims for defamation against Dzielak and Sentinel since republication of a defamatory statement is itself defamatory. Restatement (Second) of Torts § 578 (1977). See Lawrence v. Bauer Pub. & Print., Ltd., supra, 89 N.J. at 461. There are also contested issues of fact as to the falsity of the statement in view of deposition testimony by several of Krauszer's witnesses that its product is in fact clear spring water. In short, viewed most favorably to Krauszer's as required on these motions for summary judgment, the article may be read as falsely stating, to the detriment of the reputation of Krauszer's and of its Covered Bridge bottled water, that water marketed as pure spring water was in fact tap water or contaminated spring water. Therefore, apart from the constitutional constraints discussed in sections II and III of this opinion, contested issues of fact material to a cause of action for defamation would be presented and the court would be required to deny summary judgment.

II
Commencing with New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court of the United States has decided a series of cases construing the First Amendment to limit the circumstances under which liability for defamation may be imposed. See, e.g., Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); Hutchinson v. Proxmire, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d *209 411 (1979); Wolston v. Readers Digest Ass'n, Inc. 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). In New York Times the Court held that to recover for defamation, a public official must demonstrate that a damaging falsehood was published with "actual malice," that is, with knowledge of its falsity or with reckless disregard for its truth. In Butts, this requirement was extended to "public figures." In Rosenbloom, a plurality of the Court concluded that the New York Times standard should apply to any publication concerning "an issue of public or general interest." However, this view was repudiated in Gertz which held the New York Times standard inapplicable to any action for "defamatory falsehood injurious to the reputation of a private individual" (418 U.S. at 346, 94 S.Ct. at 3010), irrespective of the degree of public interest in the publication.[1] The Court in Gertz also refined its definition of a person who is a "public figure" subject to the New York Times standard in pursuing a defamation action. It said that a person who is not a "public figure for all purposes and in all contexts" may become a "public figure" for a "limited range of issues" by injecting himself or being drawn into a particular public controversy.
Every decision of the Court dealing with the limitations upon liability for defamation imposed by the First Amendment has involved personal defamation. See, e.g., Gertz v. Welch, supra, (attorney accused of being a "Communist fronter" and having a criminal record); St. Amant v. Thompson, supra (deputy sheriff accused of accepting a bribe). The Court has never *210 had occasion to consider the applicability of the principles developed in the New York Times line of cases to actions for the alleged defamation of business enterprises or the disparagement of their products or services.[2] However, a number of state and lower federal courts have considered the issue, with varying and often confusing results.
A primary source of the confusion has been the efforts of the lower courts to take terminology employed by the Supreme Court in defining the constitutional protections required in the area of personal defamation, such as "public figure" and "public controversy," and to apply that terminology in determining what constitutional protections, if any, must be extended to a party who is alleged to have defamed a business or one of its products or services. For example, in Bruno &. Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583 (1st Cir.1980), a defamation action arising out of a series of articles concerning alleged defects in commercial fishing boats which may have caused the boats to sink, the court held that the defendant newspaper could *211 not invoke the protections of New York Times because the boat manufacturer was not a "public figure." While recognizing that the boat manufacturer had advertised its product, the court said this would not necessarily qualify, in the language of Gertz, as "thrusting themselves to the forefront of [a] particular public controversy in order to influence the resolution of the issues involved." Id. at 588. The court observed that "the mere selling of products itself cannot easily be deemed a public controversy" (Id. at 589-590) and hence that the newspaper would be entitled to the protections of New York Times only if it could show that a public controversy implicating the boat manufacturer or its products had existed before the newspaper ran its series of articles. Similarly, in Vegod Corp. v. American Broadcasting Companies, Inc., 25 Cal.3d 763, 603 P.2d 14, 160 Cal. Rptr. 97 (1979), cert. den. 449 U.S. 886, 101 S.Ct. 242, 66 L.Ed.2d 113 (1980), which arose out of a television story that plaintiffs were selling inferior merchandise at inflated prices at a "closing out sale" in an inner city department store, the court found the New York Times protections inapplicable because "a person in the business world advertising his wares does not necessarily become part of an existing public controversy." It follows, the court concluded, that "those assuming the role of business practice critic do not acquire the First Amendment privilege to denigrate such entrepreneur." Id., 25 Cal.3d at 770, 603 P.2d at 18, 160 Cal. Rptr. at 101. In General Products Co., Inc. v. Meredith Corp., 526 F. Supp. 546 (E.D.Va. 1981) the court concluded that the publisher of a magazine article dealing with the safety risks of wood stove and chimney units, including the risk of chimney fires, was not entitled to the protection of the New York Times standard. It said that there was no "indication of any public controversy surrounding the use of triple-walled chimneys, that the plaintiff has injected itself or been drawn into ..., or that it has engaged in any media blitz to influence the public on a matter of public interest." Id. at 552.
Although a number of defamation actions involving business enterprises or their products and services have been held to be *212 governed by New York Times, this conclusion generally has been reached only where the court has been able to find, sometimes by a rather strained analysis, that the business enterprise was a "public figure." For example, in Reliance Insurance Co. v. Barron's, 442 F. Supp. 1341 (S.D.N.Y. 1977), the court found that a corporation which issued a preliminary prospectus to the investment community in connection with an offering of stock was a "public figure," at least as to matters relating to the proposed stock sale, and that a financial magazine which published an article asserting that the prospectus was misleading could rely upon New York Times in defending the ensuing defamation action. The court based this conclusion on the size of the corporation, the great public interest in its activities, and the fact that it "was, at the time of the libel, offering to sell its stock to the public, thereby voluntarily thrusting itself into the public arena, at least as to all issues affecting that proposed stock sale." Id. at 1348. In Steaks Unlimited, Inc. v. Deaner, 623 F.2d 264 (3rd Cir.1980), the court concluded that through an "advertising blitz" promoting the sale of beef and the receipt by the Bureau of Consumer Affairs of complaints concerning the quality of the beef, plaintiff had "so thrust itself into the purview of the Pittsburgh area public that the company can be characterized as a public figure for purposes of the controversy giving rise to this litigation." Id. at 273. And in Bose Corp. v. Consumers Union of U.S., Inc., 508 F. Supp. 1249, 1271-1274 (D.Mass. 1981), rev'd on other grounds, 692 F.2d 189 (1st Cir.1982), cert. granted, ___ U.S. ___, 103 S.Ct. 1872, 76 L.Ed.2d 805 (1983), the court held that the manufacturer of a newly designed loudspeaker system had "thrust itself into the vortex of public controversy" and become a "public figure" through aggressive marketing of its new product which included inviting outside organizations, such as defendant publisher of Consumer Reports, to conduct acoustical tests on the loudspeaker system.
The approach these cases have taken in determining the extent of First Amendment protection to be accorded news stories about business enterprises and their products or services *213 has not been satisfactory.[3] Individuals who are interested in political and social issues may "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issue involved." Gertz v. Robert Welch, Inc., supra, 418 U.S. at 345, 94 S.Ct. at 3009-10. However, businesses engaged in selling products or services generally are not involved in "the resolution of issues" or "public controversies." What businesses do is market their products and services by promotional activity, such as advertising, which includes representations about the quality of the products and services. The object of marketing is not involvement in "public controversy." Indeed, businesses often go to great lengths to avoid public controversy. Rather, the object of marketing is to foster a favorable public image of a product or service to the end of maximizing sales. Therefore, the terms "public figure" and "public controversy" are poorly suited to the description of business enterprises or their marketing of products and services.
Moreover, the Court's limitation of the availability of the New York Times standard of liability to personal defamation actions brought by public officials and "public figures" was predicated on a societal value which is absent or only remotely *214 implicated in business defamation actions. That societal value was described by the Court as "the individual's right to the protection of his own good name." Gertz v. Robert Welch, Inc., supra, 418 U.S. at 341, 94 S.Ct. at 3008. The limitation of the New York Times standard to public officials and "public figures" was characterized by the Court as "an accommodation of the competing values at stake in defamation suits by private individuals" for vindication of their personal reputations. Id. 418 U.S. at 348, 94 S.Ct. at 3011. However, a statement that a product is unsafe or does not contain the attributes claimed by the seller does not implicate "the individual's right to the protection of his own good name." Therefore, there is no reason to conclude that the Supreme Court would hold that the First Amendment protections offered to publishers of allegedly defamatory statements about products or services are to be determined by the same standards as statements which are personally defamatory. The scope of those protections should be determined not by a mechanistic application of terms such as "public figure" and "public controversy" but rather by an independent examination of the First Amendment and other competing societal values involved in the context of business defamation.
The first key to determining the proper standard of liability for an alleged defamatory statement about a business or its product or service lies in the recognition that a "consumer's interest in the free flow of commercial information ... may be as keen, if not keener by far, than his interest in the day's most urgent political debate." Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 763, 96 S.Ct. 1817, 1826, 48 L.Ed.2d 346 (1976). Therefore, consumers have a First Amendment interest in obtaining information about the products or services they buy which is comparable to their interest in being informed about political and social issues. Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). And the media has a corresponding right to convey that information. Bigelow v. Virginia, 421 U.S. 809, *215 828-829, 95 S.Ct. 2222, 2235-36, 44 L.Ed.2d 600 (1975). As the court observed in Steaks Unlimited, Inc. v. Deaner, supra:
Regardless whether particular statements made by consumer reporters are precisely accurate, it is necessary to insulate them from the vicissitudes of ordinary civil litigation in order to foster the First Amendment goals mentioned above. As the Supreme Court recognized in New York Times, "would-be critics... may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." To the extent this occurs, consumers would be less informed, less able to make effective use of their purchasing power, and generally less satisfied in their choice of goods. 623 F.2d at 280.
The second important point in determining the appropriate standard for imposition of liability in this context is that a business voluntarily exposes itself  or at least its product or service  to public examination in much the same fashion as does a public official or public figure. In Gertz the Court said that the most important reason for distinguishing between, on the one hand, private individuals, and on the other hand, public officials and "public figures," is the "compelling normative consideration" that generally "public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." 418 U.S. at 344-345, 94 S.Ct. at 3010. The same may be said about a business which makes representations about the content, quality or safety of its products or services. A business voluntarily enters the market for the purpose of selling a product or service from which profits may be derived. This marketing activity, in the language of Gertz, "invites attention and comment." 418 U.S. at 345, 94 S.Ct. at 3009. In addition, like public officials and public figures, businesses can advertise and otherwise communicate with the public and in this way "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." 418 U.S. at 344, 94 S.Ct. at 3009.
Therefore, the values identified by the Court in Gertz in balancing the First Amendment interest in the free flow of *216 information with the State's interest in the protection of reputation lead to the conclusion that news stories about the quality or contents of products and services, such as the Sentinel story about Krauszer's Covered Bridge bottled water, should receive the same protection as those dealing with public officials and public figures. Put another way, Consumer Reports is entitled to the same First Amendment protections when it reports that a consumer product is unsafe or unhealthy or is marketed through misrepresentations as the New York Times enjoys when it reports that a public official has violated the public trust or is unfit for his position. Accordingly, Sentinel and Ms. Dzielak are entitled to the protection of the New York Times standard of liability in defending Krauszer's action against them.[4]

III
Krauszer's complaint against Paterson has generated confusion because it is labeled as a claim for negligence rather than for defamation. In moving for summary judgment, Paterson argues that it had no relationship with Krauszer's and therefore owed it no duty in testing its bottled water and reporting the results to Dzielak. See Pennsylvania Nat. Turf Club v. Bank of W. Jersey, 158 N.J. Super. 196, 203 (App.Div. 1978); J.H. Becker, Inc. v. Marlboro Tp., 82 N.J. Super. 519, 530 (App.Div. 1964). However, a party does have a duty under certain circumstances not to communicate false information about another party or a product it sells. The parameters of that duty and the circumstances under which an action may be *217 maintained for its breach are the subject of the laws of defamation and of product disparagement. See generally, W. Prosser, The Law of Torts, (4th ed. 1971) § 111, § 128. The law of defamation "... embodies the important public policy that individuals and business entities should generally be free to enjoy their reputations unimpaired by false and defamatory attacks." Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 557 (1955). Related interests are protected by the law of product disparagement. See System Operations, Inc. v. Scientific Games Development Corp., 555 F.2d 1131, 1139-1141 (3rd Cir.1977). Consequently a statement that a business has misrepresented the contents or quality of its product may result in the imposition of liability for defamation (Restatement (Second) of Torts, § 558, § 561) or for product disparagement. Restatement (Second) of Torts, § 623A.
Furthermore, a party who claims that its reputation has been damaged by a false statement cannot circumvent the strictures of the law of defamation or of product disparagement by labeling its action as one for negligence. Thus, in Rainier's Dairies v. Raritan Valley Farms, Inc., supra, 19 N.J. at 564 the court held that the privileges applicable in a defamation action may not be circumvented by pleading the case as one for malicious interference with business relations. Cf. Genito v. Rabinowitz, 93 N.J. Super. 225 (App.Div. 1966) (filing of false complaint is only actionable if elements of malicious prosecution are established and proof of those elements may not be avoided by labeling the claim as one for false imprisonment). By the same token, a party against whom an action for damage to reputation has been brought cannot avoid liability by saying that it owes no duty to avoid making false statements about a business or its products, for the laws of defamation and of product disparagement do impose such a duty. Therefore, the sufficiency of Krauszer's allegations against Paterson must be *218 determined by the principles governing claims for defamation and/or product disparagement.[5]
Paterson urges that there is no evidence to show that it could have known that the results of its tests would be published in a newspaper. If Paterson had simply tested the Covered Bridge water in response to a request from a user of the water, it probably would be entitled, even without the benefit of New York Times, to a qualified privilege, provided the test results were furnished under an honest belief in their truth and without express or actual malice. Cf. Krumholz v. TRW, Inc., 142 N.J. Super. 80, 84 (App.Div. 1976) (credit reporting agency possesses qualified privilege to furnish false information concerning a person's credit rating to one of its subscribers). However, Ms. Dzielak testified in depositions that she told employees at Paterson that she was "compiling information for an article on spring water." If that testimony were accepted, it reasonably could be found that Paterson knew or should have known that its test results would not merely be used by Ms. Dzielak for her own guidance as a consumer but might be published in a newspaper. Under those circumstances, Paterson would not be entitled to invoke any common law privilege. Restatement (Second) of Torts § 595, § 604.
Therefore, Paterson's motion for summary judgment requires the court to decide whether there must be a showing of "actual malice," as defined in New York Times, for Paterson to be held liable even though it is neither a newspaper publisher nor a reporter. Stated another way, the issue is whether the source of a news story is entitled to the same or similar protection from suit for defamation as the reporter and newspaper which publish the story. Somewhat surprisingly, while *219 there has been extensive litigation over the constitutional right of reporters not to reveal the identity of sources (See, e.g., Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, (1972); Maressa v. New Jersey Monthly, 89 N.J. 176 (1982); see generally, Note, "Source Protection in Libel Suits After Herbert v. Lando," 81 Colum.L.Rev. 338 (1981)), no direct consideration appears to have been given to the scope of potential liability for defamation to which an identified news source is exposed.
The Court observed in a footnote in a recent opinion that it has never decided whether the New York Times standard of liability applies to a non-media defendant. Hutchinson v. Proxmire, supra. 443 U.S. at 133, n. 16, 99 S.Ct. at 2687, n. 16. And several recent cases, such as Gertz, suggest that the New York Times standard only may be invoked by a media defendant. See, Note, "Mediaocracy and Mistrust: Extending New York Times Defamation Protection to Nonmedia Defendants," 95 Harv.L.Rev. 1876, 1877 (1982). On the other hand, there are earlier cases in which there was no media defendant and yet the New York Times standard was applied. St. Amant v. Thompson, supra, (defendant was candidate for public office); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (defendant was district attorney). Indeed, in New York Times itself the defendants included not only the Times but also a group of civil rights activists who had placed a paid political advertisement in the paper, and the Court drew no distinction among the defendants in holding that "actual malice" must be shown for liability to be imposed.
Furthermore, any attempt to limit New York Times to media defendants would be inconsistent with the Court's frequent statements that the institutional press does not occupy a preferred status under the Speech Clause of the First Amendment. See, e.g., Houchins v. KQED, Inc., 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978); First National Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); see generally, Blanchard "The Institutional Press and Its First Amendment Privileges," 1978 Sup.Ct.Rev. 225 (1979). Consequently, a majority *220 of lower courts which have directly considered the issue have concluded that the New York Times standard of "actual malice" is available to both media and nonmedia defendants. See, e.g., Avins v. White, 627 F.2d 637, 649 (3rd Cir.1980) cert. den. 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980); Davis v. Schuchat, 510 F.2d 731, 734 (D.C. Cir.1975); Rodriguez v. Nishiki, 65 Hawaii 430, 653 P.2d 1145 (Sup.Ct. 1982). See also Barbetta Agency, Inc. v. Evening News Pub. Co., supra, 135 N.J. Super. at 222-223. (noting, but finding it unnecessary to decide the issue); Restatement (Second) of Torts, § 580A, comment h.
In any event, even if the New York Times standard of liability were not equally available to media and nonmedia defendants, a person who had acted as a source of information for a news story would have a special claim to such constitutional protection. The Supreme Court has recognized that the Speech Clause of the First Amendment protects the rights not only of those who wish to speak but also of those who may be recipients of information. Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); Pell v. Procunier, 417 U.S. 817, 832, 94 S.Ct. 2800, 2809, 41 L.Ed.2d 495 (1974). The Court has also recognized that newsgathering by the press enjoys First Amendment protection. Branzburg v. Hayes, supra, 408 U.S. at 681, 92 S.Ct. at 2656 ("without some protection for seeking out the news, freedom of the press could be eviscerated.") Consequently, the free flow of information from a potential source of a news story implicates the First Amendment rights of the newspaper and of its readers. And if a potential source of a news story could be held liable for defamation without any showing of "actual malice," such exposure could produce a reluctance to furnish information. The consequence would be the same as the media refraining from publishing a story due to fear of liability for defamation; the public would be denied information on a topic in which it has a vital interest. Therefore, there are persuasive reasons for concluding that the umbrella of protection afforded by the New York Times standard *221 of liability should be as broad for the source of a news story as for the media which publishes the story.
The argument for extending such protection to a source such as Paterson is especially compelling. The role played by Paterson in the preparation of the articles is similar in some respects to that of the reporter, Dzielak. She required technical assistance in determining the content of Krauszer's water. A publication such as Consumer Reports probably has persons on its staff with the technical competence to perform that type of analysis. If such a staff person participated in writing a story, there is little doubt that person would be considered a "media defendant," assuming such status were required in order to rely upon New York Times. However, a small publisher such as Sentinel ordinarily does not have scientific technicians on its staff. Consequently, it must retain the services of an outside consultant when preparing a story such as the one which is the subject of this suit. Unless the consultant is treated as a "media defendant" and extended the same protection from suit as the newspaper by which it is retained, the ability of a newspaper to secure technical assistance in preparing a story will be seriously hampered.
Therefore, this court concludes that Paterson is entitled to the same protection from liability for defamation provided by the New York Times "actual malice" standard as Sentinel and Dzielak.

IV
Since the claims against all defendants are governed by New York Times, Krauszer's has the burden of producing clear and convincing proof that defendants published false statements, knowing of their falsity or with reckless disregard for the truth. Gertz v. Welch, supra, 418 U.S. at 342, 94 S.Ct. at 3008. Moreover, reckless disregard for the truth "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must *222 be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, supra, 390 U.S. at 731, 88 S.Ct. at 1325; see also Lawrence v. Bauer Pub. & Print. Ltd., supra, 89 N.J. at 466-468.
The matter is before the court on motions for summary judgment, and hence the question is whether there is any genuine issue of fact material to the prerequisites for maintenance of a defamation action under New York Times. In considering this question, this court is mindful of the admonition in Kotlikoff v. The Community News, supra, 89 N.J. at 67-68, that trial courts should "give particularly careful consideration to identifying appropriate cases for summary judgment disposition in this area of [First Amendment] law." See also Maressa v. New Jersey Monthly, supra, 89 N.J. at 196-198.
Although Krauszer's has presented sufficient evidence on which to base a finding of the falsity of defendant's statements that Covered Bridge was not spring water, there is no evidence on which to base a finding that any defendant knew those statements to be false or in fact entertained serious doubts of their truth.
With respect to the claim against Paterson, the undisputed evidence is that Dzielak submitted a bottle of unidentified water to the laboratory to determine whether it was spring water, that they performed normal tests on the water, including a test for chlorine, and then reported to Dzielak that the presence of a significant amount of chlorine indicated that it was not spring water. At worst, Paterson might be found negligent for failing to advise Dzielak that the validity of its test results could have been affected by the fact that the bottle was open when brought to them. Therefore, Paterson cannot be found to have actual knowledge of the probable falsity of its test results in any respect material to Krauszer's claim.
In arguing that Dzielak and Sentinel had actual knowledge of the probable falsity of the statement that Covered Bridge was *223 not spring water, Krauszer's relies principally upon the fact that Dzielak had obtained a prior analysis of the water from another laboratory, New Jersey Laboratories, which concluded that it contained no chlorine. However, Dzielak had ample reason to question the accuracy of the New Jersey Lab results and to seek a second opinion. Her discussions with employees at New Jersey Labs revealed that Krauszer's was one of their clients and that they were so sure Covered Bridge water contained no chlorine that they considered any test to be "unnecessary." Furthermore, the fact that a negligible amount of water was removed from the bottle and that it was in the same location when she returned to the testing lab as when she left caused Dzielak to doubt whether New Jersey Labs had in fact performed any tests.
Krauszer's also argues that in view of the conflicting reports received from Paterson and New Jersey Labs, Dzielak should have obtained another analysis before submitting her article. This failure may amount to sloppy journalism but it does not evidence an actual awareness of the probable falsity of Paterson's test results. Furthermore, Dzielak did seek an analysis by another lab before the actual publication of the article but had difficulty understanding the test results since no chlorine reading was reported. In short, all Krauszer's can show is that two laboratories reported different results and that a third laboratory report was not fully understood.
Krauszer's also points out that Dzielak acknowledges being aware that Paterson's test results could have been affected by the fact that the water sample supplied them was from an open bottle. However, her impression, as reflected in the article, was that this circumstance might cause a chlorine reading to be reduced, but could not account for the presence of chlorine in the water.
Therefore, the facts relied upon by Krauszer's in opposing summary judgment fall far short of providing a foundation for a *224 finding by clear and convincing evidence that any defendant in fact subjectively entertained serious doubt as to the accuracy of the Paterson report. Summary judgment will be entered in favor of all defendants.
NOTES
[1] A state court may require satisfaction of the New York Times standard in a wider range of situations than mandated by the Supreme Court of the United States, if that result is found to be required by a state's own constitution or the common law of defamation. See Steaks Unlimited, Inc. v. Deaner, 623 F.2d 264, 272 (3rd Cir.1980); Diversified Management, Inc. v. The Denver Post, 653 P.2d 1103 (Colo. 1982). See also, Barbetta Agency, Inc. v. Evening News Pub. Co., 135 N.J. Super. 214, 221-222 (App.Div. 1975). However, the Supreme Court of New Jersey has applied the New York Times standard based upon the "public figure" analysis of Gertz without suggesting any inclination to adopt a more expansive view as a matter of state law. See Lawrence v. Bauer Pub. & Print., Ltd., supra.
[2] Although Krauszer's claims against the reporter and newspaper are for defamation, they also could be viewed as claims for "product disparagement" (also referred to as "injurious falsehood," "slander of goods" and "trade libel," see W. Prosser, The Law of Torts (4th ed. 1971) § 128, at 915-916), since the central allegation of the complaint is that defendants made a false statement about the contents of plaintiff's bottled water. See System Operations, Inc. v. Scientific Games Development Corp., 555 F.2d 1131, 1139-1144 (3rd Cir.1977); Note, "Corporate Defamation and Product Disparagement: Narrowing the Analogy to Personal Defamation," 75 Colum. L.Rev. 963, 964-972 (1975). However, the distinction between the torts is blurred in a factual setting such as this where disparagement of the product has a natural tendency to stain the reputation of the business. See W. Prosser, supra, § 128 at 918. In any event, the First Amendment protection to which a publisher is entitled when an alleged false statement has been made about a product should not turn on whether the claim is categorized as business defamation or product disparagement since any privilege available in a defamation action ordinarily may be invoked in an action for product disparagement. W. Prosser, supra, § 128, at 924-926. See Bose Corp. v. Consumers Union of U.S., Inc., 508 F. Supp. 1249, 1270-1271 (D.Mass. 1981), rev'd on other grounds, 692 F.2d 189 (1st Cir.1982), cert. granted ___ U.S. ___, 103 S.Ct. 1872, 76 L.Ed.2d 805 (1983).
[3] These decisions have been criticized by some law journal commentators. See, e.g., Fetzer, "The Corporate Defamation Plaintiff as First Amendment `Public Figure': Nailing the Jellyfish," 68 Iowa L.Rev. 35 (1982); Comment, "A Criticism of the Gertz Public Figure/Private Figure Test in the Context of the Corporate Defamation Plaintiff," 18 San Diego L.Rev. 721 (1981). See also, Note, "Corporate Defamation and Product Disparagement: Narrowing the Analogy to Personal Defamation," supra.

One lower federal court has concluded that the "public figure" test of Gertz should not apply to corporate defamation but rather, reverting to the plurality opinion in Rosenbloom, that the New York Times defense should be available so long as a publication which allegedly defamed a corporation concerns "an issue of public or general interest." Martin Marietta Corp. v. Evening Star Newspaper Co., 417 F. Supp. 947 (D.D.C. 1976). However, this approach assigns undue weight to whether a business happens to operate in corporate form. The focus should be instead on the nature of the allegedly defamatory communication  that is, whether it is directed at an individual or at products or services sold to the public.
[4] A different conclusion might be reached in a case in which a competitor rather than a newspaper was the publisher of a false statement about a business or its product. Such a statement probably would be characterized as "commercial speech, that is expression related solely to the economic interests of the speaker and its audience." (Central Hudson Gas & Elec. Corp. v. Public Service Comm's of N.Y., 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980)), which is entitled to "a lesser protection ... than ... other constitutionally guaranteed expression." Id. at 563, 100 S.Ct. at 2350.
[5] Although Krauszer's complaint is grounded solely on negligence it has indicated an intention by supplemental letter brief to amend its complaint to add a count for defamation. See R. 4:9-2. Since the factual allegations are the same and all parties have now had an opportunity to brief the issue, the complaint will be deemed to have been so amended and its sufficiency will be determined at this time.