**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0621-22

BRAINBUILDERS, LLC,

     Plaintiff-Appellant,

v.

OPTUM, INC., OPTUM
SERVICES, INC.,
OPTUMHEALTH HOLDINGS,
LLC, OPTUMHEALTH
FINANCIAL SERVICES, INC.,
OPTUMHEALTH CARE
SOLUTIONS, LLC,
OPTUMHEALTH CARE
SOLUTIONS, INC., OXFORD
HEALTH INSURANCE, INC.,
OXFORD HEALTH PLANS (NY),
INC., OXFORD HEALTH PLANS
(NJ), INC., OXFORD HEALTH
PLANS LLC,
UNITEDHEALTHCARE
SERVICES, LLC,
UNITEDHEALTH GROUP, INC.,
UNITEDHEALTHCARE
SERVICES, INC., UHIC
HOLDINGS, INC., UNITED
BEHAVIORAL HEALTH, and
UNITEDHEALTHCARE
INSURANCE COMPANY,

Defendants-Respondents.

_____

Argued April 9, 2024 – Decided April 19, 2024

Before Judges Mayer, Enright and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-8088-17.

Vafa Sarmasti argued the cause for appellant (Sarmasti PLLC, attorneys; Vafa Sarmasti, on the briefs).

Robert J. Norcia argued the cause for respondents (Stradley Ronon Stevens & Young, LLP, attorneys; Francis X. Manning, of counsel; Robert J. Norcia, on the brief).

PER CURIAM

Plaintiff BrainBuilders, LLC appeals from a September 12, 2022 order granting summary judgment in favor of defendants Optum, Inc., Optum Services, Inc., OptumHealth Holdings, LLC, OptumHealth Financial Services, Inc., OptumHealthcare Solutions, LLC, OptumHealth Care Solutions, Inc. (Optum entities), Oxford Health Insurance, Inc., Oxford Health Plans (NY), Inc., Oxford Health Plans (NJ), Inc., Oxford Health Plans LLC (Oxford entities), UnitedHealthcare Services, LLC, UnitedHealth Group, Inc., UnitedHealthcare Services, Inc., UHIC Holdings, Inc., United Behavioral Health, and

2

UnitedHealthcare Insurance Company (UHC entities) (collectively, defendants). We affirm.

This matter concerns letters dated July 25, 2017 and August 2017 sent by the Optum entities to BrainBuilders' patients following an investigation into purported fraud by individuals associated with BrainBuilders.

BrainBuilders provides healthcare services to children on the autism spectrum. As an out-of-network or non-participating healthcare provider, BrainBuilders received reimbursement for claims only if a patient's health insurance plan allowed "out-of-network benefits" or the insurer made a "single case agreement" for the patient's care.

The Optum entities are the health claims administrator for health plans issued or administered by the Oxford entities and UHC entities. The Optum entities do not sell or issue health insurance policies. Rather, they provide support for defendants who issued health insurance policies to individual insureds.

The Optum entities also evaluate insurance claims submitted by providers to its affiliated insurers, including BrainBuilders. The Optum entities often investigate whether a provider has requested reimbursement beyond the provider's entitlement, such as by misrepresenting or inflating the services

A-0621-22

provided. In January 2017 through approximately May 2017, the Optum entities reviewed BrainBuilders' claims submitted for reimbursement, due to the significant number of claims and the amounts charged in comparison to BrainBuilders' peers.

In June 2017, four individuals related to the management of BrainBuilders were arrested and charged with conspiracy to defraud Medicaid. A criminal complaint, alleging misappropriation of funds, was filed against several individuals affiliated with BrainBuilders. The arrests were reported in the news media and the Optum entities learned of the arrests on July 14, 2017.

On July 25, 2017, the Optum entities sent letters to BrainBuilders' patients insured by the Oxford and UHC entities (July 2017 letters). The July 2017 letters explained the Optum entities were suspending payment for services provided by BrainBuilders "due to potential insurance fraud and other violations of state and federal law." The letters, advising patients insured under healthcare plans issued by the Oxford and UHC entities, stated:

> Optum is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to Optum members. The availability of benefit coverage for a service is determined by the terms of your benefit plan.
>
> This letter is to notify you that, effective [thirty] days from [insert termination date], [insert provider name]

4 <span>A-0621-22</span>

will no longer be reimbursed for services provided to you and/or your child/ren due to potential insurance fraud and other violations of state and federal law. Services provided by [insert provider name] after this date may not be covered under your benefit plan.

If you are in active, ongoing treatment with this practitioner, you may continue to receive services from this practitioner until [thirty] days after [insert termination date], subject to medical record review or other benefit plan requirements.

Optum is able to assist you in making arrangements for your continued treatment with a participating practitioner.  Please contact us at your earliest convenience at 866-xxx-xxxx so we can assist you in locating a new provider.  Our goal is to make any needed transition in your treatment as smooth as possible.

Again, if you choose to continue to see your current practitioner beyond [thirty] days after [insert termination date], you may be financially responsible for the cost of those services and have no coverage available under your benefit plan.

In August 2017, the Optum entities sent letters to BrainBuilders' patients.

(August 2017 letters).  The letters stated:

Dear [name redacted]:

United Behavioral Health (UBH) is responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to Oxford Health Insurance, Inc. NY-PPO members. The availability of benefit coverage for a service is determined by the terms of your benefit plan.  To

5

review information about your specific plan coverage, please refer to the benefit information provided by your health plan.

I have reviewed your treatment plan that was submitted by Brain[B]uilders[,] LLC, and I have determined that coverage is not available under your benefit plan for the requested services of Applied Behavior Analysis.

As described in the section of your Certificate of Coverage: Based on current information available to the plan, authorization is not available due to quality of care or member safety concerns and is excluded under your plan as Non-Professional Care which is an express exclusion from coverage under your plan.

This determination does not mean that you do not require additional health care, or that you need to be discharged. Decisions about continuation of treatment should be made by you and your provider. The purpose of this letter is to inform you that coverage is not available under your benefit plan for the requested service. On 8/8/2017 1:23 PM CDT we notified your provider of this determination by telephone.

Under federal law, you have a right to request the diagnosis and diagnosis code provided to us by your provider. Alternately, you may request this information from your provider.

Please refer to the enclosed form(s) for information about your available options to appeal or dispute this determination.

Based on the July and August 2017 letters, BrainBuilders filed a lawsuit against defendants. BrainBuilders asserted the following causes of action: conspiracy; tortious interference with business relations; tortious interference

6

with prospective economic advantage; negligence, trade libel; defamation, libel, and slander; and unjust enrichment and quantum meruit. BrainBuilders alleged the statements in the July and August 2017 letters were false and defamatory.

Defendants moved for summary judgment and BrainBuilders opposed the motion. In support of summary judgment, defendants argued the July and August 2017 letters were subject to a qualified privilege because the Optum entities had a legal obligation to inform members of the true reason for suspending BrainBuilders' services and, eventually, denying authorizations. Additionally, defendants asserted the July and August 2017 letters were not reasonably susceptible of defamatory meaning, were true or expressions of opinion, and BrainBuilders failed to demonstrate the statements in the letters were actuated by malice or that it suffered damages.

On August 26, 2022, the motion judge heard the parties' arguments on defendants' motion for summary judgment. In a September 12, 2022 order and written statement of reasons, the judge granted defendants' motion and dismissed BrainBuilders' claims with prejudice.

The judge found the statements in the July and August 2017 letters sent by the Optum entities were subject to qualified immunity. The judge explained the healthcare industry in New Jersey is heavily regulated and healthcare service

7

providers "are contractually required by health benefits plans to communicate with members and, therefore, deal with them in good faith regarding all things that implicate the availability of benefits under a plan." Thus, the judge concluded, "[t]he statements communicated to [BrainBuilders] and its patients in the July 2017 and August 2017 [l]etters [were] plainly subject to and protected by a qualified privilege."

Additionally, the judge found the Optum entities commenced an investigation into BrainBuilders' claims for reimbursement prior to the arrests of individuals associated with the company. The judge stated the Optum entities were suspicious of BrainBuilders' claims for reimbursement based on its recent increase in patients treated and the volume of claims it submitted when compared to similar service providers. The judge noted the Optum entities commenced a formal fraud investigation into BrainBuilders' activities upon learning of the arrests of individuals associated with BrainBuilders. As the judge found, the results of the investigation led the Optum entities to suspect BrainBuilders "potentially committed insurance fraud" and "raised questions as to the legitimacy of the services rendered by [BrainBuilders] and the bills submitted to [d]efendants."

The judge rejected BrainBuilders' defamation claim. He found "[a] reasonable person would not interpret Optum's July 2017 and August 2017 [l]etters as defamatory." Because the July 2017 letters used the word "potential" preceding the word "fraud," the judge found the "use of the word 'potential' remove[d] any suggestion that BrainBuilders actually committed fraud and other violations of state and federal law." The judge concluded "the July 2017 [l]etters communicated the reason for the suspension and merely indicated that insurance fraud by BrainBuilders was 'capable of coming into being; possible if the necessary conditions exist.'" Regarding the August 2017 letters, the judge determined those letters "merely communicated Optum's 'concerns' about 'quality of care or member safety' in making a decision regarding the availability of coverage for BrainBuilders' services."

The judge specifically highlighted the context in which the Optum entities sent the July and August 2017 letters. He explained that shortly before the letters were sent to BrainBuilders' patients, "several individuals at the highest ranks of BrainBuilders, as well as several other parents of BrainBuilders' patients, had been arrested for conspiracy to commit Medicaid fraud (i.e., insurance fraud), and news of their arrests was widespread in the media." Further, around the same time period, the judge noted the Optum entities "separately uncovered

9

evidence suggesting BrainBuilders was engaged in fraud, waste, or abuse." Thus, the judge concluded, "[w]hen read with context, no reasonable person" could interpret the July or August 2017 letters "as fallacious or injurious."

The judge expressly rejected BrainBuilders' claim that the statements in the July and August 2017 letters were defamatory. The judge explained truth was an absolute defense to a defamation claim and found the statements in the July and August 2017 letters "were true."

Even before the arrests of individuals associated with BrainBuilders, the judge noted "Optum had already begun reviewing [BrainBuilders'] claims to investigate its high utilization." After the arrests were reported in the news media, the judge explained the Optum entities opened a formal fraud investigation. Based on that formal fraud investigation, the judge stated forensic accountants for the Optum entities "uncovered evidence suggesting the existence of potential insurance fraud not only by [BrainBuilders]" but by individuals "who had obtained health benefits plans from Oxford Health Plans (NJ), Inc. and used those plans almost exclusively for reimbursement of [BrainBuilders'] services." Thus, the judge determined the July 2017 letters conveyed the Optum entities' true reason for suspending authorization for BrainBuilders' services.

Similarly, the judge found the August 2017 letters conveyed the true reason for the denial of authorizations for BrainBuilders' services. As the judge noted, "[a]llegations of potential health insurance fraud necessarily implicate[d] the value and quality of the services rendered." The judge concluded "the statement[s] in the July 2017 and August 2017 letters [were] not defamatory" because the statements were true.

Additionally, the judge found BrainBuilders failed to demonstrate it suffered actual damages to prevail on its defamation claim. After months of discovery, the judge concluded BrainBuilders failed to "suppl[y] any documentation or other evidence of actual harm to its reputation, nor ha[d] it provided proof that it lost any patients or otherwise suffered a general diminution in business value that was the natural and direct result of Optum's allegedly defamatory statements."

The judge also rejected BrainBuilders' claim that defendants' statements in the July and August 2017 letters were made with actual malice to prevail on its defamation claim. The judge found BrainBuilders was required "to present 'clear and convincing evidence' that could 'support a reasonable jury finding' that Optum's statements in the July 2017 and August 2017 [l]etters were motivated by 'actual malice'" by showing the statements were knowingly false or made

11

with reckless disregard for the truth. The judge concluded BrainBuilders was "unable to make such a showing." Further, because the Optum entities undertook a forensic analysis of BrainBuilders' activities, which revealed "dubious billing and treatment issues," the judge determined "Optum's conduct was not motivated by actual malice, but by a detailed investigation which resulted in the discovery of concerning information."

Because the judge found the statements in the July and August 2017 letters were "not defamatory," he dismissed BrainBuilders' conspiracy and tortious interference claims, as those claims were predicated on the same conduct and statements as the defamation claims.

The judge also dismissed BrainBuilders' negligence claim, finding such a theory must be asserted as a claim for defamation or trade libel. Because the judge rejected the defamation and trade libel claims against defendants, he explained BrainBuilders' negligence claim necessarily failed.

Similarly, the judge dismissed BrainBuilders' quasi-contract claims for unjust enrichment and quantum meruit "because an insurer derives no benefit from the provision of services on an insured." Relying on a federal case, the judge noted that the benefit, if any, "is not the provision of the healthcare services per se, but rather the discharge of the obligation the insurer owes to the

insured." Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co., 967 F.3d 218, 240 (3d Cir. 2020). The judge determined BrainBuilders' quasi-contract claims required demonstration that it conferred a benefit on defendants. Because BrainBuilders failed to present evidence of any benefit it conferred on defendants, the judge dismissed those claims.

On appeal, BrainBuilders argues the judge erred in granting summary judgment to defendants. Specifically, BrainBuilders contends the Optum entities were not entitled to a qualified privilege and the issue should have been presented to a jury. BrainBuilders also asserts it presented evidence in support of its defamation claim, including evidence that defendants' statements were made with actual malice and it suffered specific damages. Additionally, BrainBuilders argues the judge erred in dismissing its other tort claims and quasi-contract claims.

We review a judge's decision on a motion for summary judgment de novo, applying the same standard as the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). We must consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Ibid. (quoting Brill v. Guardian Life Ins. Co.

of Am., 142 N.J. 520, 540 (1995)).  If there is no genuine issue of material fact, we must then "decide whether the trial court correctly interpreted the law." Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007).  We accord no deference to a trial court's legal conclusions and review issues of law de novo.  Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

We first consider whether the statements in the July and August 2017 letters were either true or constituted opinions to establish a defense to BrainBuilders' defamation claim.

"Our law of defamation is grounded on the principle that people should be free 'to enjoy their reputations unimpaired by false and defamatory attacks.'" Fees v. Trow, 105 N.J. 330, 336 (1987) (quoting Swede v. Passaic Daily News, 30 N.J. 320, 331 (1959)).  "A defamatory statement, generally, is one that subjects an individual to contempt or ridicule, one that harms a person's reputation by lowering the community's estimation of [them] or by deterring others from wanting to associate or deal with [them.]"  Petro-Lubricant Testing Labs., Inc. v. Adelman, 233 N.J. 236, 253 (2018) (quoting Durando v. Nutley Sun, 209 N.J. 235, 248-29 (2012)).  To prevail on a defamation claim, a party must demonstrate:  "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third

14

party; and (3) fault amounting at least to negligence by the publisher." Leang v. Jersey City Bd. of Ed., 198 N.J. 557, 585 (2009).

"Whether the meaning of a statement is susceptible of a defamatory meaning is a question of law for the court." Ward v. Zelikovsky, 136 N.J. 516, 529 (1994). Under the first element necessary to prevail on a defamation claim, a plaintiff must demonstrate the publisher "made a false and defamatory statement." G.D. v. Kenny, 205 N.J. 275, 292-93 (2011). "If a statement is not legally defamatory, summary judgment is appropriate." G.D. v. Kenny, 411 N.J. Super. 176, 188 (App. Div. 2009), aff'd, 205 N.J. 275 (2011).

True statements are "not actionable as defamation." Hart v. City of Jersey City, 308 N.J. Super. 487, 492 (App. Div. 1998). Our courts have stated that true statements are "absolutely protected under the First Amendment" from liability for defamation. G.D., 205 N.J. at 293 (quoting Ward, 136 N.J. at 530). True statements may provide a defense even when the statement contains "minor inaccuracies." Id. at 294. The hallmark of the defense is "substantial truth." Ibid. (quoting Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516 (1991)).

Here, the allegedly defamatory statements in the July and August 2017 letters related to BrainBuilders' "potential fraud," potential "violations of state

15

and federal law," and concerns for "quality of care or member safety." It is uncontroverted that several of BrainBuilders' officers were arrested for conspiracy to defraud Medicaid in association with "income they received from BrainBuilders." These individuals were arrested because they potentially committed fraud. Additionally, the arrests raised legitimate concerns regarding the quality of care rendered by BrainBuilders.

While BrainBuilders disputed the Optum entities' motivation for undertaking a formal investigation, it is undisputed that the Optum entities investigated the claims submitted by BrainBuilders after the reported arrest of several of BrainBuilders' officers. Given the fact that several of BrainBuilders' officers were arrested for defrauding Medicaid in connection with BrainBuilders' business operations, the Optum entities' statements in the July and August 2017 letters were true and presented a complete defense to the defamation claim.

We reject BrainBuilders' argument that the statements in the July and August 2017 letters were false. Contrary to BrainBuilders' assertions, the Optum entities never stated BrainBuilders committed insurance fraud or violated criminal laws. Rather, the letters advised patients of "potential insurance fraud and other violations of state and federal law." The judge relied

on the dictionary definition of the word "potential" as "[c]apable of coming into being; possible if the necessary conditions exist." See also Black's Law Dictionary 1413 (11th ed. 2019). Applying this definition, the use of the term "potential" is not an affirmative statement that BrainBuilders violated the law or committed insurance fraud. The July 2017 letters never stated BrainBuilders engaged in "widespread illegal conduct." Nothing about the Optum entities' use of the word "potential" rendered the July 2017 letters misleading. Nor did the July 21017 letters inform patients that BrainBuilders committed fraud or other illegal acts to support its defamation claim.

Similarly, the fact that BrainBuilders was not charged with any crime, separate from its officers who were charged with fraud, does not render the statements in the July and August 2017 letters untruthful. We see no distinction for purposes of a defamation claim between BrainBuilders as a company and the individuals associated with BrainBuilders who were charged with a crime. The veil of suspicion regarding potential fraud fell on BrainBuilders as well as its officers, even if the company was not named in the criminal complaint.

We similarly reject BrainBuilders' argument that defendants bore the burden of demonstrating substandard, unsafe, or unprofessional patient care. To prevail on its defamation claims, BrainBuilders had to demonstrate the

statements in the July and August 2017 letters were false.  G.D., 205 N.J. at 292-93.  BrainBuilders failed to do so.

Further, BrainBuilders' reliance on the Optum entities' September 14, 2017 report to demonstrate the statements in the July and August 2017 letters were defamatory is misplaced.  The September 2017 report was issued after the Optum entities sent the alleged defamatory letters to BrainBuilders' patients.

Because we are satisfied the July and August 2017 letters failed to satisfy the first element to sustain a claim for defamation–that the letters contained a false and defamatory statement–we need not address BrainBuilders' arguments related to the judge's determinations regarding qualified privilege, actual malice, and actual damages.

We next consider BrainBuilders' claim that the judge erred in dismissing its claims for tortious interference with current business relations, tortious interference with prospective economic advantage, and negligence.  We disagree.

"[I]f an intentional tort count . . . is predicated upon the same conduct on which the defamation count is predicated, the defamation cause completely comprehends" the intentional tort claims.  LoBiondo v. Schwartz, 323 N.J. Super. 391, 417 (App. Div. 1999); see also Binkewitz v. Allstate Ins. Co., 222

N.J. Super. 501, 516 (App. Div. 1988) (holding "words which are absolutely privileged against an action for defamation are also absolutely privileged against an action for tortious interference with contract or economic advantage."). Additionally, "a party who claims that its reputation has been damaged by a false statement cannot circumvent the strictures of the law of defamation . . . by labeling its action as one for negligence." Dairy Stores, Inc. v. Sentinel Pub. Co., Inc., 191 N.J. Super. 202, 217 (Law Div. 1983), aff'd, 104 N.J. 125 (1986).

Here, the judge found BrainBuilders' other tort claims were "predicated on the same conduct and statements" as its defamation claim. Thus, the judge properly dismissed BrainBuilders' other tort claims as duplicative of the defamation claim.

We next consider BrainBuilders' argument that the judge erred in dismissing its quasi-contract claims for unjust enrichment and quantum meruit. Again, we disagree.

"To prove a claim for unjust enrichment, a party must demonstrate that the opposing party 'received a benefit and that retention of that benefit without payment would be unjust.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 288 (2016) (quoting Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 110 (2007)). The party must also "show that it expected remuneration from the defendant at the time it

performed or conferred a benefit on [the] defendant and that the failure of remuneration enriched [the] defendant beyond its contractual rights." Ibid. (quoting Iliadis, 191 N.J. at 110).

"Quantum meruit is a form of quasi-contractual recovery and 'rests on the equitable principle that a person shall not be allowed to enrich [themselves] unjustly at the expense of another.'" Starkey, Kelly, Blaney & White v. Est. of Nicolaysen, 172 N.J. 60, 68 (2002) (internal quotation marks omitted) (quoting Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437 (1992)). To prevail, the plaintiff must establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Ibid. (quoting Longo v. Shore & Reich, Ltd., 25 F.3d 94, 98 (2d Cir. 1994)); see also F. Bender, Inc. v. Jos. L. Muscarelle, Inc., 304 N.J. Super. 282, 285 (App. Div. 1997) (noting quantum meruit requires unjust enrichment).

Here, the record is devoid of evidence showing BrainBuilders conferred any benefit on defendants to prevail on its unjust enrichment claim. BrainBuilders alleged it conferred a benefit on defendants by way of "services that were provided by BrainBuilders and for which there has been no compensation or with respect to which there has been substantial

underpayment." BrainBuilders further alleged it "expected to be paid for the services it provided to patients that were or are insured by. . . [d]efendants."

To succeed on its quasi-contract claims, BrainBuilders was required to demonstrate it performed or conferred a benefit upon defendants and expected remuneration. In the July and August 2017 letters, the Optum entities advised BrainBuilders it would no longer receive reimbursement for submitted claims. In light of the statements in the July and August 2017 letters, BrainBuilders failed to explain why it continued to expect compensation or identify services provided to specific patients for which it expected to be paid. Moreover, BrainBuilders conferred only benefits to the insured members and not defendants. Under these circumstances, we are satisfied BrainBuilders failed to proffer any support for its unjust enrichment and quantum meruit claims.

To the extent we have not addressed any remaining arguments, those arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21