37 A.3d 449

RONALD DURANDO AND GUSTAVE DOTOLI, PLAINTIFFS–APPELLANTS, v. THE NUTLEY SUN AND NORTH JERSEY MEDIA GROUP, INC., DEFENDANTS–RESPONDENTS.

Argued January 5, 2011—Reargued November 29, 2011—Decided February 28, 2012.

Hoens, J., filed dissenting opinion joined by LaVecchia, J.

238

*Glenn M. Finkel* argued the cause for appellants (*Schepisi & McLaughlin,* attorneys; *Mr. Finkel* and *Christopher A. Stewart,* on the briefs).

*Bruce S. Rosen* argued the cause for respondents (*McCusker, Anselmi, Rosen & Carvelli,* attorneys; *Jennifer A. Borg* and *Dina L. Sforza,* of counsel; *Mr. Rosen* and *Kathleen A. Hirce,* on the briefs).

*Thomas J. Cafferty* argued the cause for amicus curiae New Jersey Press Association (*Gibbons,* attorneys; *Mr. Cafferty, Nomi I. Lowy,* and *Lauren James–Weir,* on the brief).

Justice ALBIN delivered the opinion of the Court.

New Jersey's common law provides special protection to speech touching on matters of public concern, even when that speech contains some careless falsehoods. A free and robust press, one that does not engage in self-censorship from fear of ruinous lawsuits, is essential to an enlightened democracy. Our jurisprudence recognizes that the free and unimpaired flow of information on matters of public concern necessarily leads to some erroneous reporting due to human error. In those circumstances, freedom of speech and the press are values that outweigh the right to security in one's personal reputation. Provided that a reporter or editor does not publish a false and defamatory statement with actual malice—that is, knowing that the statement is false or recklessly disregarding the truth—the erroneous statement contained in an article touching on a matter of public interest is not actionable.

In this case, a regional weekly newspaper inaccurately printed a front-page "teaser," reporting that "two local men," plaintiffs—whose names were not mentioned in the teaser—had been arrested for stock fraud. The two men were charged with illicit stock manipulation in a complaint filed by the Securities and Exchange Commission, but they had not been arrested. Readers who turned to the article on page eleven learned that plaintiffs were the subject of a civil complaint alleging that they had bilked unsuspecting investors of nine million dollars. No word or phrase in the article itself suggested that plaintiffs had been arrested.

Plaintiffs filed a civil action against defendants, the newspaper and its parent company, alleging, among other things, defamation and false light. The trial court granted summary judgment to defendants, finding that plaintiffs could not establish that the teaser was published with actual malice. The Appellate Division upheld that decision.

We affirm. Although this case unquestionably involves sloppy journalism, the careless acts of a harried editor, the summary-judgment record before us cannot support a finding by clear and convincing evidence that the editor knowingly or in reckless disregard of the truth published the false teaser.

## I.

On November 15, 2005, the Securities and Exchange Commission (SEC) filed a complaint in the United States District Court for the District of Connecticut against Ronald Durando and Gustave Dotoli (residents of Nutley), charging them with various violations of federal securities laws.[1] The complaint alleged that Durando and Dotoli acquired "control of a failed and indebted company," changed the company's name, inflated "the trading price of the company's stock through false publicity," and then sold the stock "to the public at artificially-inflated prices for large profits." As a result of this "fraudulent 'pump and dump' market manipulation scheme," the complaint alleged that Durando and Dotoli (and other defendants) "gained more than $9 million in proceeds from illegal sales of essentially worthless" stock. The SEC specifically charged Durando and Dotoli with "illegal insider trading," filing "reports containing false and misleading statements," and other violations of federal securities laws. The SEC sought to have Durando and Dotoli disgorge all proceeds "received

---

[1] Because defendants had moved for summary judgment, we state these facts in a light most favorable to plaintiffs. *See G.D. v. Kenny*, 205 *N.J.* 275, 304, 15 A.3d 300 (2011) (citations omitted); *R.* 4:46–2(c).

from the illegal conduct" and to enjoin them permanently from becoming officers or directors in any publicly traded company.[2]

On November 17, 2005, *The Record*—a newspaper owned by North Jersey Media Group—published an article written by staff writer Kathleen Lynn about the SEC complaint. The headline of the article read: "3 N.J. men accused in $9M stock scam." The article in its entirety is set forth below:

Three New Jersey men pumped up the price of a worthless stock, then dumped it on unsuspecting investors in a $9 million scheme, the Securities and Exchange Commission said Wednesday.

According to the SEC, which filed a civil complaint Tuesday in Connecticut, the scheme involved a telecommunications company called PacketPort.com of Norwalk, Conn.

According to the SEC, Ronald Durando, 48, of Nutley, bought a controlling stake in an insolvent company called Linkon. Working with Gustave Dotoli, 70, of Nutley, and attorney Robert H. Jaffe, 69, of Mountainside, Durando changed the company's name to PacketPort.com, the SEC said. Durando became CEO and Dotoli the chief financial officer.

Durando then allegedly paid IP Equity Inc., a California company that ran an Internet stock newsletter, to tout PacketPort.com to investors as a promising company in the business of Internet phone service.

As a result of this publicity, the stock price rose to about $19.50, the SEC said. Then, the SEC said, Durando, Dotoli, Jaffe, and IP Equity and its principals dumped the shares—which the SEC called "essentially worthless"—for a total of more than $9 million.

They sold most of the shares through New York stockbroker William Coons III, the SEC said.

The SEC also says that Durando, Dotoli and Jaffe falsified PacketPort.com's financial reports.

The SEC complaint names Durando, Dotoli, Jaffe, Coons, and the two IP Equity principals, M. Christopher Agarwal and Theodore Kunzog, as defendants. The complaint, which seeks disgorgement of the profits, alleges fraud and violations of various securities laws.

Lawyers for Durando, Dotoli and Jaffe did not return calls seeking comment.

The civil case was filed in U.S. District Court in New Haven.

No one disputes that the article accurately described the contents of the SEC complaint. Neither the SEC complaint nor the article suggested that Durando and Dotoli were arrested.

---

[2] Durando and Dotoli later entered into a settlement agreement with the SEC.

The North Jersey Media Group also owns *The Nutley Sun*, a local weekly newspaper with approximately 5000 subscribers in Nutley Township and neighboring communities. The executive editor of *The Nutley Sun*, Paul Milo, received permission to reprint Lynn's article in *The Record* about Durando and Dotoli. On December 5, 2008, Milo prepared the article for publication in *The Nutley Sun*'s December 8 edition—a promotional issue circulated to 2500 non-subscribers in addition to the weekly's regular subscribers. Milo removed the last three paragraphs of the original article so that it would fit within his weekly newspaper's space constraints. He also wrote a new headline for the article: "Local men charged in stock scheme."

The following day, December 6, 2005, Milo composed three "teasers" for the front page of the December 8 edition of *The Nutley Sun*, referencing different articles within the newspaper.[3] The teaser for the reprinted article read: "Local men arrested in 'pump and dump' scheme, page 11." That teaser—the third listed on the upper portion of the front page—was not only smaller in font than the lead teaser, which was in bold print, but also was in much smaller font than the bold-print lead headline, entitled "Peace on earth." The "pump and dump" teaser did not mention the names of either Durando or Dotoli. Nevertheless, the statement in the teaser that local men were "arrested" was erroneous. That error was not repeated in the text of the article on page eleven of the paper.

The day after publication, December 9, plaintiffs' attorney sent an email to *The Nutley Sun* pointing out that his clients had not been "arrested." Plaintiffs' counsel demanded a retraction and threatened to file suit. That same day, after conferring with his publisher, Milo forwarded the email to in-house counsel for the North Jersey Media Group, Dina Sforza. Sforza did not contact Milo until December 14—one day after the deadline for placing a

---

[3] A "teaser" is a brief headline intended to catch the eye and encourage people to buy the periodical.

retraction in *The Nutley Sun's* next edition. On December 15, Sforza called plaintiffs' counsel and requested that he delay filing a lawsuit until after she had time to discuss the matter with general counsel to the North Jersey Media Group, Jennifer Borg. Plaintiffs' counsel told Sforza that he would not file a lawsuit until after December 19. Borg, whose approval was necessary before publication of a retraction, was unavailable the week of December 15 because she was tending to a dying relative at Hackensack Medical Center.

On December 19, Borg gave approval for the filing of a retraction, and indeed one was published in boldface and large print on the front page of *The Nutley Sun's* December 22 edition.[4] This edition, however, was not circulated to the 2500 non-subscribers who received the December 8 edition with the erroneous teaser. On December 16, plaintiffs' counsel already had filed the lawsuit, which is the subject of this appeal.

## II.

### A.

The December 16 complaint filed by plaintiffs Durando and Dotoli alleged that defendants, *The Nutley Sun* and North Jersey Media Group, Inc., had committed the tort of libel. An amended complaint filed ten months later listed the additional tort claims of casting one in a false light and intentional and negligent infliction of emotional distress. Plaintiffs sought compensatory, emotional-distress, and punitive damages.

---

[4] The retraction, which appeared in the same spot as the teaser, stated:

The Nutley Sun hereby retracts the headline "Local men arrested in 'pump & dump' scheme", which appeared on page A-1 of the Dec. 8 edition. Ronald Durando and Gustave Dotoli were not arrested, but were served with a civil complaint by the federal Securities and Exchange Commission. The Nutley Sun regrets the error and any embarrassment it may have caused Mr. Durando and Mr. Dotoli.

One month later, Milo was reprimanded in writing by *The Nutley Sun's* publisher for printing the inaccurate teaser.

For our purposes, an extensive discussion of the procedural history is not necessary. Suffice it to say, the trial court ultimately granted summary judgment in favor of defendants on all claims and dismissed the complaint. With respect to the false-light claim, the trial court found that the article touched on a matter of public concern but initially denied summary judgment because, in its view, Milo had "obvious reasons to doubt the veracity" of the teaser in light of Lynn's article. However, the court later reconsidered its grant of summary judgment on the false-light claim, focusing on whether Milo acted with actual malice in publishing the erroneous teaser. The most relevant evidence touching on whether Milo acted with actual malice is found in his deposition testimony and his later certification.

## B.

Milo was deposed almost a year after the publication of the "pump and dump" article. He explained that he was the executive editor of both *The Nutley Sun* and *The Belleville Times,* another local weekly newspaper. In that capacity, he performed editorial and administrative functions, overseeing a staff of ten people. Although he was aware that the SEC "regulate[s] the stock/investment industry," he did not know whether it pursued criminal prosecutions. Milo understood the difference between civil and criminal actions. In preparing the teaser for the "pump and dump" article, Milo relied solely on Lynn's article; he did not review the SEC's press release. He did not recall his thought process in preparing the teaser, but conceded that in using the word "arrested," he "had made a mistake." In a colloquy with plaintiffs' counsel, Milo responded to a series of questions about his understanding of the term "arrested" and whether he believed that plaintiffs had been subject to an arrest and a criminal prosecution:

Q. You said you don't recall whether or not you thought it was a criminal action, but you wrote that they had been arrested?

A. Right.

Q. So what did you mean happened to them by using the word "arrested"?

A. That they had done something criminal.

. . . .

Q. *What caused you to believe that these men had been arrested?*

. . . .

A. *Beyond making an error—I mean, I have no other way to answer that question except to say that I made a mistake.*

. . . .

Q. And when you edited the article, did you believe that these—that [Durando] and [Dotoli] had been arrested?

. . . .

A. *I don't remember what my belief was at the time I edited the article.*

. . . .

Q. Did you confidently believe that they had been arrested? Were you certain that they had been arrested?

A. I don't remember what my belief was, like, at the time I wrote that teaser.

Q. So is it possible that you were not sure that they were arrested?

A. Yes.

Q. *Is it possible that you entertained doubts as to whether or not they had been arrested?*

. . . .

A. *It's possible, but I don't remember, just in answer to that previous question.*
 [ (Emphasis added).]

After that exchange and a lunch break, during which Milo conferred with counsel, Milo returned to the deposition and stated that he "missed the nuance" in the last questions posed by plaintiffs' counsel. Milo made clear that when he wrote the teaser he harbored no doubts about its accuracy, despite the fact that he evidently made a mistake. Milo concluded that the erroneous teaser "got [in the paper] because at the time I wrote it, I thought it was the truth."

In a certification attached to defendants' summary-judgment motion, Milo asserted that he changed *The Record*'s headline from "3 N.J. men accused in $9M stock scam" to "Local men charged in stock scheme" because, in his mind, the term "charged" was synonymous with "accused." He offered that there was no reason to write the word "arrested" rather than "accused" as both have the same journalistic weight. Furthermore, he maintained that he "would never endanger [his] credibility or livelihood by purposely

or recklessly making a mistake anywhere in the newspaper, let alone on the front page."

Milo also described his busy work schedule, which includes reading hundreds of pieces of correspondence each week leading up to publication. Tuesday night, when he wrote the teaser, is the most hectic time of the week because of the need to meet the printer's hard deadline. Milo emphatically denied doubting the accuracy of the teaser at the time that he wrote it.

### C.

The trial court granted defendants' motion for reconsideration and entered summary judgment in favor of defendants on the false-light claim. In dismissing plaintiffs' action, the court reviewed the record and governing legal authorities, concluding that there was not "sufficient evidence from which a jury could clearly and convincingly conclude that any ... of the defendants acted with actual malice." The court emphasized that, to satisfy the actual-malice standard, plaintiffs needed to show more than that Milo departed from the conduct of a reasonably prudent editor. The court did not consider it decisive that Milo, at one point during the deposition, said "that it was possible that he was not sure at the time of publication as to the details of the arrest." In that regard, the court observed: "[T]hat someone was possibly uncertain at the time of publication, does not show sufficient clear and convincing evidence ... that the media defendants, in fact, entertained serious doubts as to the truth of the publication."

### III.

In an unpublished opinion, the Appellate Division affirmed, finding that "there simply is not 'clear and convincing' evidence of actual malice here to warrant a jury trial" on defamation or false light. The panel reasoned that the "careless and unfortunate" use of the inaccurate word "arrested" was not sufficient to "satisfy the legal and constitutional requirements for liability." Like the trial court, the panel highlighted that plaintiffs' theory of the case

rested on a "singular and tentative response" by Milo at deposition "that it was 'possible' that he was not sure about whether plaintiffs had been arrested when he printed the headline." The panel noted Milo's clarification of that response and "the dearth of other evidence of reckless disregard for the truth." The panel also observed that plaintiffs could not "point to any evidence that Milo was informed prior to publication as to the falsity of his headline, or [that he was] provided with an obvious basis to reflect upon the truth of the teaser headline." Accordingly, the record did "not present 'clear and convincing' evidence" for "plaintiffs to survive summary judgment."

We granted plaintiffs' petition for certification. *Durando v. Nutley Sun,* 203 *N.J.* 93, 999 *A.*2d 462 (2010).[5] We also granted the motion of the New Jersey Press Association to participate as amicus curiae.

## IV.

### A.

Our state common law, which is informed by the free-speech and -press guarantees of Article I, Paragraph 6 of the New Jersey Constitution, provides enhanced protection to speech touching on matters of public concern and interest. *Senna v. Florimont,* 196 *N.J.* 469, 489–90, 958 *A.*2d 427 (2008).[6] We give such speech the protection of the actual-malice standard because of the "significant societal benefit in robust and unrestrained

---

[5] Plaintiffs did not press their claims for intentional and negligent infliction of emotional distress on appeal. In any event, because those torts are predicated on the same conduct alleged in the defamation and false-light claims, they too would be governed by the actual-malice standard. *See G.D., supra,* 205 *N.J.* at 307, 15 *A.*3d 300.

[6] New Jersey "provide[s] greater protection to speech involving matters of public concern than mandated by the United States Supreme Court's First Amendment jurisprudence." *Senna, supra,* 196 *N.J.* at 484–85, 958 *A.*2d 427 (citation omitted).

debate on matters of public interest" and because "[e]ven the fear of having to defend against a defamation suit may make some too timid to venture into discussions where speech may be prone to error." *Id.* at 491–92, 958 *A.*2d 427 (citations omitted). In a series of cases, we have applied the actual-malice standard to defamation lawsuits brought by private-figure plaintiffs against media defendants that have purportedly published erroneous news stories regarding a matter of public interest or concern. *See, e.g., Turf Lawnmower Repair, Inc. v. Bergen Record Corp.,* 139 *N.J.* 392, 413, 423, 655 *A.*2d 417 (1995); *Sisler v. Gannett Co.,* 104 *N.J.* 256, 279, 516 *A.*2d 1083 (1986); *Dairy Stores, Inc. v. Sentinel Publ'g Co.,* 104 *N.J.* 125, 146, 516 *A.*2d 220 (1986).

Plaintiffs acknowledge that the actual-malice standard applies to their defamation and false-light claims and do not dispute the contours of that standard. Plaintiffs simply contend that they have "establish[ed] by 'clear and convincing' evidence that genuine issues of material fact exist with respect to whether or not [d]efendants published the false teaser headline with 'actual malice.'" Therefore, they claim that the Appellate Division erred in affirming the trial court's grant of summary judgment.

In deciding that issue, we address in turn the elements of defamation and false-light claims, the standard of actual malice that applies to these claims, and the summary-judgment standard governing this case.

### B.

To succeed in a defamation action against a media defendant that publishes an article touching on a matter of public interest or concern, a plaintiff must prove three elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the statement was communicated to another person (and was not privileged); and (3) that the defendant published the defamatory statement with actual malice. *G.D., supra,* 205 *N.J.* at 292–93 & n. 7, 15 *A.*3d 300. "A defamatory statement, generally, is one that subjects an individual to con-

tempt or ridicule, one that harms a person's reputation by lowering the community's estimation of him or by deterring others from wanting to associate or deal with him." *Id.* at 293, 15 *A.*3d 300 (citations omitted).

A plaintiff also has a cause of action if a defendant publicizes a matter that portrays him "before the public in a false light." *Romaine v. Kallinger,* 109 *N.J.* 282, 294, 537 *A.*2d 284 (1988) (quoting *Restatement (Second) of Torts* § 652E (1977)). To prove the tort of false light, a plaintiff must satisfy two elements. He must show (1) that "the false light in which [he] was placed would be highly offensive to a reasonable person" and (2) that the defendant "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff] would be placed." *Ibid.* (quoting *Restatement (Second) of Torts, supra,* § 652E). The second prong of a false-light claim parallels the requirements of the actual-malice standard in First Amendment jurisprudence and our own common law.

We next discuss the jurisprudential underpinnings and definition of actual malice in cases involving speech-based torts.

## C.

The actual-malice standard came into being as a means of protecting the First Amendment principles of freedom of speech and freedom of the press. *See New York Times Co. v. Sullivan,* 376 *U.S.* 254, 279–80, 84 *S.Ct.* 710, 726, 11 *L.Ed.*2d 686, 706 (1964). In *New York Times,* the United States Supreme Court held that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 *S.Ct.* at 726, 11 *L.Ed.*2d at 706. The Court further held that actual malice must be established with "convincing clarity." *Id.* at 285–86, 84 *S.Ct.* at 729, 11 *L.Ed.*2d at 710. The Court's decision underscored "a profound national commitment to the principle

that debate on public issues should be uninhibited." *Id.* at 270, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701. In discarding the lower common-law standard of proof, and adopting the heightened standard of "actual malice," the Court was acutely aware that "libel suits threatened to bankrupt newspapers like the *New York Times* and therefore 'dampen[ ] the vigor and limit[ ] the variety of public debate,' even discouraging truthful speech out of 'fear of the expense' of defending against such suits." *Senna, supra,* 196 *N.J.* at 483, 958 *A.*2d 427 (alteration in original) (quoting *New York Times, supra,* 376 *U.S.* at 277–79, 84 *S.Ct.* at 724–26, 11 *L.Ed.*2d at 705–06).

As mentioned earlier, this Court "expanded free speech protections under our common law-beyond the mandate of federal law—" to cases involving media and media-related defendants "and applied the actual-malice standard to investigative news stories that addressed matters of public concern." *Id.* at 485–86, 958 *A.*2d 427 (discussing *Turf Lawnmower Repair, supra,* 139 *N.J.* 392, 655 *A.*2d 417; *Sisler, supra,* 104 *N.J.* 256, 516 *A.*2d 1083; *Dairy Stores, supra,* 104 *N.J.* 125, 516 *A.*2d 220). The media receives "enhanced protections when it publishes information on subjects related to health and safety, highly regulated industries, and consumer fraud"—all matters of public concern. *Id.* at 495, 958 *A.*2d 427. Today, in New Jersey the actual-malice standard protects both media and non-media defendants who make statements involving matters of public concern, regardless of whether the targets of the statements are public figures or private persons. *See id.* at 496–97, 958 *A.*2d 427; *Sisler, supra,* 104 *N.J.* at 279, 516 *A.*2d 1083; *Dairy Stores, supra,* 104 *N.J.* at 146, 516 *A.*2d 220.

Additionally, the actual-malice standard applies to all speech-based torts involving matters of public concern or public officials. *See DeAngelis v. Hill,* 180 *N.J.* 1, 6, 19, 847 *A.*2d 1261 (2004) (applying actual-malice standard to false-light claim brought by police officer against private citizen); *Hornberger v. Am. Broad. Cos.,* 351 *N.J.Super.* 577, 597–98, 799 *A.*2d 566 (App.Div. 2002) (applying actual-malice standard to false-light claim); *see*

*also Hustler Magazine v. Falwell,* 485 *U.S.* 46, 56, 108 *S.Ct.* 876, 882, 99 *L.Ed.*2d 41, 52 (1988) (imposing standard on public figure who sued for intentional infliction of emotional distress). No one questions that the content of the article in this case involves a matter of public concern.

■ Actual malice is defined similarly under federal and state law. *See Rocci v. Ecole Secondaire Macdonald–Cartier,* 165 *N.J.* 149, 156, 755 *A.*2d 583 (2000) (treating common-law actual malice and constitutional actual malice synonymously). In a speech-based tort case involving a media defendant, "a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity." *Dairy Stores, supra,* 104 *N.J.* at 151, 516 *A.*2d 220; *accord New York Times, supra,* 376 *U.S.* at 279–80, 84 *S.Ct.* at 726, 11 *L.Ed.*2d at 706. In this case, plaintiffs contend that Milo, the executive editor of *The Nutley Sun,* acted with reckless disregard of the truth.

■ The reckless-disregard-for-the-truth prong has been defined in a variety of different ways, but the core principle has remained constant: establishing reckless disregard requires a showing that the defendant made the statement with a "high degree of awareness of [its] probable falsity." *Garrison v. Louisiana,* 379 *U.S.* 64, 74, 85 *S.Ct.* 209, 216, 13 *L.Ed.*2d 125, 133 (1964). The test is subjective, not objective, and involves analyzing the thought processes of the particular defendant-in this instance, Milo. *See Costello v. Ocean Cnty. Observer,* 136 *N.J.* 594, 617, 643 *A.*2d 1012 (1994). The standard is not measured by how the reasonably prudent editor would have handled the matter. *St. Amant v. Thompson,* 390 *U.S.* 727, 731, 88 *S.Ct.* 1323, 1325, 20 *L.Ed.*2d 262, 267 (1968). Rather, to prove reckless disregard, there must be sufficient evidence that the named "defendant in fact entertained serious doubts as to the truth of the publication." *Ibid.*

■ That an editor or reporter "*should have* known" or "*should have* doubted [the] accuracy" of an article before publish-

ing it is insufficient to show reckless disregard for the truth. *Lawrence v. Bauer Publ'g & Printing Ltd.*, 89 *N.J.* 451, 467, 446 *A.*2d 469 (1982). Thus, the actual-malice test will shield careless acts of publication that would be considered irresponsible by common journalistic standards. *Id.* at 468, 446 *A.*2d 469. For example, the clumsy editing of an otherwise accurate article in a way that falsely stated that an attorney was under investigation—a mistake made by the defendant due to "haste to edit the article while managing multiple responsibilities"—was insufficient to meet the actual-malice threshold. *Schwartz v. Worrall Publ'ns, Inc.*, 258 *N.J.Super.* 493, 497, 502, 610 *A.*2d 425 (App.Div.1992).

 To act with reckless disregard of the truth, a defendant must *"actually* doubt[ ]" the veracity of the article. *Lawrence, supra,* 89 *N.J.* at 468, 446 *A.*2d 469. Only "[i]f the recklessness approaches the level of publishing a knowing, calculated falsehood," based on the summary-judgment record, should the case go to the jury. *Maressa v. N.J. Monthly,* 89 *N.J.* 176, 200, 445 *A.*2d 376 (1982).

 Although the actual-malice standard is difficult to meet, a plaintiff will satisfy that standard—despite an editor's professions of good faith—if he can show a story was "fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." *St. Amant, supra,* 390 *U.S.* at 732, 88 *S.Ct.* at 1326, 20 *L.Ed.*2d at 268. Likewise, a publisher will not "prevail" when his "allegations are so inherently improbable that only a reckless man would have put them in circulation" or when "there are obvious reasons to doubt the veracity of [an] informant or the accuracy of his reports." *Ibid.; accord Lynch v. N.J. Educ. Assoc.,* 161 *N.J.* 152, 165, 735 *A.*2d 1129 (1999).

We next address the summary-judgment standard that applies to a speech-based tort involving a media defendant that publishes an article involving a matter of public interest or concern.

## V.

■ To defeat defendants' motion for summary judgment in this case, plaintiffs must establish that a reasonable jury could conclude by "clear and convincing evidence" that Milo published the erroneous teaser with actual malice. *See Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 255–56, 106 *S.Ct.* 2505, 2514, 91 *L.Ed.*2d 202, 216 (1986). "Although courts construe the evidence in the light most favorable to the non-moving party in a summary judgment motion, the 'clear and convincing' standard in [a] defamation action adds an additional weight to the plaintiffs' usual 'preponderance of the evidence' burden." *Costello, supra,* 136 *N.J.* at 615, 643 *A.*2d 1012.[7]

*Costello, supra,* is an example of the heavy burden that a plaintiff faces in vaulting the actual-malice threshold in the summary-judgment context. In *Costello,* the *Ocean County Observer* published an article that erroneously related the contents of a court file. 136 *N.J.* at 604–05, 643 *A.*2d 1012. The newspaper reported on a draft, unsigned civil complaint that was appended to an unrelated order-to-show-cause pleading as though the complaint itself was filed and part of an ongoing proceeding. *Id.* at 601–04, 643 *A.*2d 1012. The draft complaint alleged that a police officer sexually abused a woman in handcuffs. *Id.* at 602, 643 *A.*2d 1012. The officer sued for defamation. *Id.* at 605, 643 *A.*2d 1012.

We determined that the article was not a "full, fair and accurate" report of a pending judicial proceeding and therefore the reporter and newspaper were not entitled to the protection of the fair-report privilege. *Id.* at 611–12, 643 *A.*2d 1012. Nevertheless, we concluded that the Appellate Division properly entered summary judgment in favor of the reporter and the newspaper because the evidence of record demonstrated that the reporter

---

[7] The application of summary-judgment principles in a case involving the actual-malice standard in a First Amendment or common-law case is the same. *See Rocci, supra,* 165 *N.J.* at 159, 755 *A.*2d 583 (citing constitutional summary-judgment standards when plaintiff was private person).

acted negligently, not with actual malice. *Id.* at 618–19, 643 *A.*2d 1012. Clearly, the "article demonstrate[d] a confused understanding of a court file." *Id.* at 619, 643 *A.*2d 1012. "Although we [did] not condone the erroneous reporting of information in court files," we recognized that "[e]rrors in reports on court proceedings are bound to occur from time to time, and the First Amendment protects those errors as long as they are not recklessly or intentionally made." *Ibid.*

As was true in *Costello,* summary judgment may play an important role in defamation cases, particularly against newspapers, because "the cost of defending a libel action can itself deter [a] free press." *Maressa, supra,* 89 *N.J.* at 196, 445 *A.*2d 376. "The threat of prolonged and expensive litigation has a real potential for chilling journalistic criticism and comment upon public figures and public affairs." *Kotlikoff v. Cmty. News,* 89 *N.J.* 62, 67, 444 *A.*2d 1086 (1982). Indeed, "[t]his is especially true of the many smaller journals and local newspapers which have played an important role in the affairs of New Jersey but which cannot withstand high litigation costs." *Maressa, supra,* 89 *N.J.* at 196, 445 *A.*2d 376. For that reason, we have "encourage[d] trial courts to give particularly careful consideration to identifying appropriate cases for summary judgment disposition" in defamation cases against newspapers. *Kotlikoff, supra,* 89 *N.J.* at 67–68, 444 *A.*2d 1086.

We now apply these principles to the facts of this case.

## VI.

██ On the summary-judgment record before us, Milo, the then-executive editor of *The Nutley Sun* for four months, was undoubtedly careless in composing the erroneous front-page teaser, "Local men arrested in 'pump and dump' scheme, page 11." After all, Lynn's article never indicated that Durando or Dotoli were arrested or being criminally prosecuted. But in determining whether the false-light claim survives summary judgment, we are not guided by the standard of how the reasonably prudent editor

would have performed the task. Rather, we must determine whether, from the record, a reasonable jury could conclude that Milo—despite his admitted mistake—entertained serious doubts about the truth of the teaser when he published it. That is, could a reasonable jury conclude that Milo's conduct was so reckless that it "approache[d] the level of publishing a knowing, calculated falsehood?" *See Maressa, supra,* 89 *N.J.* at 200, 445 *A.*2d 376. Even viewing the evidence in the light most favorable to plaintiffs, the answer to that question is no. The reasons for this conclusion are many.

One does not have to condone Milo's shoddy editing to understand how he might have made the mistake in preparing the teaser, a day after he had read Lynn's article. Clearly, the article spoke about the civil complaint filed by the SEC against Durando and Dotoli, and Milo knew the difference between civil and criminal actions. But the language of the SEC complaint, as reflected in the article, also bespeaks criminality. The article stated that three men, including plaintiffs, "pumped up the price of a worthless stock, then dumped it on unsuspecting investors in a $9 million scheme." According to the article, the scheme was executed by taking an insolvent company, changing its name (basically repackaging it), and then falsely advertising it to investors as "a promising company in the business of Internet phone service."

Had Milo read the actual SEC complaint, perhaps, the chance of a mistake would have been magnified. The complaint charged Durando and Dotoli with violations of federal securities laws, including the commission of "illegal insider trading" and the filing of "reports containing false and misleading statements." Under the New Jersey Code of Criminal Justice, a person commits the crime of theft "if he purposely obtains property of another by deception." *See N.J.S.A.* 2C:20-4. That bears mentioning not because plaintiffs were charged with committing a crime, but because the language of the article sounded like a crime. That is not in any way to excuse Milo's mistake, for nowhere in Lynn's article or in the SEC's complaint or press release is there any

suggestion that plaintiffs were arrested, and Lynn's article made reference only to a civil complaint.

This record does not permit us to conclude that Milo's professions—that he made a mistake—are inherently incredible or improbable. He was a harried editor, responsible for a staff of ten and reading hundreds of pieces of correspondence, racing to meet a printing deadline. Somehow, he mistakenly reconfigured the headline of the article, "Local men charged in stock scheme," to the front-page teaser, "Local men arrested...."

Importantly, plaintiffs are not named in the teaser. Any reader who turned to page eleven of the paper learned in paragraphs one and two of the article, even before they reached the names Durando and Dotoli in paragraph three, that the two men were subject to a *civil complaint* filed by the SEC. As defendants have explained, the teaser and the article itself are somewhat contradictory, at least to anyone familiar with criminal and civil matters. The evidence does not suggest that Milo would have subjected himself to professional ridicule by making such a mistake or misstatement of the truth. Once the mistake was revealed to him by plaintiffs' counsel, he set in motion steps to correct it.[8]

Not much can be made of Milo's deleting the last three paragraphs of Lynn's article to fit within the space requirements of his weekly newspaper. While it is true that one of those paragraphs noted again that the SEC complaint was a "civil case," another omitted paragraph included the damning information that the complaint "alleges fraud and violations of various securities laws." The editing does not suggest that Milo attempted to mislead the reader.

Like the trial court and the Appellate Division, we do not place much stock in the brief exchange between Milo and plaintiffs' counsel at deposition about whether it was "possible" Milo thought Durando and Dotoli had not been arrested. What we do know is

---

[8] That Milo's error occurred in a promotional issue is not sufficient to establish that he had a motive to propagate a falsehood.

that Milo admitted he made a mistake, did not recall his exact thought processes when he prepared the teaser, and believed it was accurate at the time of publication.

Plaintiffs' case can go forward only if, reviewing the entirety of the record in the light most favorable to them, Milo's professions are unworthy of belief. Given the heightened protections for free speech and a free press under the actual-malice standard, and the failure of plaintiffs to establish by clear and convincing evidence a jury issue, we come to the same conclusion as the trial court and the Appellate Division—summary judgment must be granted.

Although plaintiffs' defamation and false-light claims must be dismissed, defendants can only take grim satisfaction with the outcome. The constitutional and common-law protections accorded to a free press place a great responsibility on the media to police itself. The primary objective of a free press is to promote the truth so that citizens will have a better understanding of current events and of the workings of their government. Falsehoods in an article that needlessly do harm to a person's reputation do not advance that objective. Moreover, "shoddy and careless reporting that leads to the dissemination of false or misleading information is detrimental to the enlightenment of a free society. A newspaper's greatest reward is the public's trust." *Costello, supra,* 136 *N.J.* at 620, 643 *A.*2d 1012.

## VII.

We affirm the Appellate Division, which upheld the trial court's grant of summary judgment in favor of defendants and dismissal of the defamation and false-light claims.

Justice HOENS, dissenting.

Much of the majority's opinion in this appeal consists of a recitation about matters that are beyond dispute and with which I am most certainly in accord. I agree, therefore, with the majority's expression of the great principles that support and surround the protections we afford to matters of free speech and a free press. *Ante* at 239, 37 *A.*3d at 451–52 (commenting on value of

"free and robust press ... that does not engage in self-censorship from fear of ruinous lawsuits"). The majority is also correct in observing that there are occasions when "the free and unimpaired flow of information on matters of public concern necessarily leads to some erroneous reporting due to human error." *Id.* at 239, 37 *A.*3d at 452.

For the most part, the majority's explanation of the principles of law that have been developed to balance the reverence that we have for a free press, and the deep respect we have for the rights of the individuals about whom false and defamatory statements are published, so as to protect both of those often-competing interests is unremarkable. The majority's discussion of the law of defamation, for example, generally echoes this Court's recent recognition that "[t]he law of defamation is rooted in the notion that individuals should be free to enjoy their reputations unimpaired by false and defamatory attacks." *Salzano v. No. Jersey Media Group, Inc.*, 201 *N.J.* 500, 505, 993 *A.*2d 778 (2010), *cert. denied,* —— *U.S.* ——, 131 *S.Ct.* 1045, 178 *L.Ed.*2d 864 (2011). And the majority's discussion relating to the law that governs defamation claims brought in the context of published newspaper articles, *see ante* at 248–49, 37 *A.*3d at 457–58, does not merit refutation.

I dissent, however, because in its analysis of the law and the facts that are evident from the record before this Court in this matter, the majority has made three fundamental errors. In short, it is because the majority has misperceived the relevance of including a falsehood in a front page teaser, has failed to weigh the factual assertions in accordance with the applicable summary judgment standards, and has effectively created a new standard for protection of journalistic practices that the majority itself denounces, that I respectfully dissent.

## I.

I dissent first because the majority has failed to appreciate the role played by a front page teaser, and has therefore misperceived

the analytical implications of a teaser both factually and as a matter of law. Commenting that the teaser did not identify plaintiffs by name, *see ante* at 255–56, 37 *A*.3d at 461–62, the majority has attempted to negate the significance of being defamed in a large-print, front page headline, and in the process has avoided having to grapple with the implications of a defamatory statement divorced from an accurate article that might otherwise be read and considered as part of a unified whole. Those analytical shortcomings led the majority to erroneous conclusions of fact and law.

When considering allegedly defamatory writings, we ordinarily have directed that the whole article or the entirety of the text should be considered. *See, e.g., Romaine v. Kallinger,* 109 *N.J.* 282, 293, 537 *A*.2d 284 (1988) (basing conclusions about defamation on import of entire chapter from which allegedly offensive passage was taken). Nonetheless, we have commented on the impact that a misleading headline has on the "full, fair and accurate" analysis in a defamation case because of its capacity to create a focus for the article that may be misleading. *See Costello v. Ocean Cnty. Observer,* 136 *N.J.* 594, 610–11, 643 *A*.2d 1012 (1994) (noting that article failed to meet "full, fair, and accurate" standard in part because headline improperly focused on plaintiff).

Even though headlines surely have the capacity to create a greater impact on the reader, we have not regarded that defamatory impact as if the headline were entirely separate from the accompanying article. Rather, our courts have cautioned that a news account should be considered as a whole, requiring that the headline and article be examined together. *See Molin v. The Trentonian,* 297 *N.J.Super.* 153, 157, 687 *A*.2d 1022 (App.Div.) (noting that majority of jurisdictions support rule that headlines "be construed in conjunction with their accompanying articles"), *certif. denied,* 152 *N.J.* 190, 704 *A*.2d 20 (1997), *cert. denied,* 525 *U.S.* 904, 119 *S.Ct.* 239, 142 *L.Ed.*2d 196 (1998).

As a result, if the only objectionable implication flows from the few words chosen for large print headlines, a complaint sounding

in defamation or false light may fall short. *Id.* at 157–59, 687 *A.*2d 1022 (surveying standards adopted in other jurisdictions and considering headline and article in context). That is, if there is an inaccuracy created by the headline, but the falsehood is immediately corrected in the opening sentence of the article itself, the news report, when evaluated as a whole, may be entitled to be protected. *See McGhee v. Newspaper Holdings, Inc.,* 115 *P.*3d 896, 898–99 (Okla.Civ.App.2005) (holding that article was accurate and complete because first line of article corrected any inaccuracy in headline); *see also Salzano, supra,* 201 *N.J.* at 537–38, 993 *A.*2d 778 (Hoens, J., concurring in part and dissenting in part) (discussing cases fixing standards for evaluation of defamatory headline attached to accurate news article).

The same result, however, does not necessarily hold true for a teaser headline. Because a teaser, by definition, is a free-standing, front page headline that is separated from the body of the article, any belief that an inaccuracy will be corrected by the attached, fully accurate, report contained in the article itself is absent. Moreover, as this record demonstrates, it is customary to present teasers in larger-than-normal or bolder-than-otherwise typeface. That visual placement and presentation compounds the risk that an inaccuracy will not be remedied because the reader may not search out and read the accurate text to learn the truth.

More to the point, because the conceded purpose of a teaser is to attract attention and, in particular, to entice a non-subscriber to purchase the publication when he or she otherwise would not, the teaser presents the significant risk that an overzealous headline writer might select a word with those purposes in mind, notwithstanding the falsity or inaccuracy of the words chosen. Further compounding the problem that teasers present, as the record in this dispute demonstrates, when the particular edition of the newspaper is also slated to be a promotional edition, with a wider circulation than normal, the risk of injury to an individual's reputation is heightened. In those circumstances, in which the inaccuracy or falsehood appears in a teaser disembodied from an

otherwise accurate article, it seems to me that, at a minimum, this Court should be hesitant to base its evaluation on the theory that the teaser and the article can simply be read as a unified whole.

## II.

Second, I dissent because the majority, by focusing on the heavy burden that plaintiffs must carry to prove actual malice, has failed to account for the ordinary standards that apply to motions for summary judgment. In the process, the majority has not only overlooked, but has magnified, the error made by the trial and appellate courts in weighing the factual assertions and applying the law to those assertions.

There is no doubt that, whether sounding in defamation or false light, *see Prosser & Keeton on the Law of Torts* § 117 at 864 (5th ed. 1984) (explaining distinctions between defamation and false light causes of action), plaintiffs' claims must be proven by a demonstration of actual malice, *see Time, Inc. v. Hill,* 385 *U.S.* 374, 387, 87 *S.Ct.* 534, 541–42, 17 *L.Ed.*2d 456, 466–67 (1967) ("[f]actual error, content defamatory of official reputation, or both, are insufficient for an award of damages for false statements unless actual malice—knowledge that the statements are false or in reckless disregard of the truth—is alleged and proved"); *Hornberger v. Am. Broad. Cos.,* 351 *N.J.Super.* 577, 598, 799 *A.2d* 566 (App.Div.2002) ("actual malice standard applies to the false light claim to avoid violation of the First Amendment's protection of freedom of expression") (citing *Hustler Magazine v. Falwell,* 485 *U.S.* 46, 56, 108 *S.Ct.* 876, 883, 99 *L.Ed.*2d 41, 53 (1988)), and through proofs that are both clear and convincing, *see Costello, supra,* 136 *N.J.* at 614, 643 *A.*2d 1012 (citing *Anderson v. Liberty Lobby, Inc.,* 477 *U.S.* 242, 254–55, 106 *S.Ct.* 2505, 2513, 91 *L.Ed.*2d 202, 215–16 (1986)).

As this Court has held, although courts construe the evidence in the light most favorable to the non-moving party in a summary judgment motion, the "clear and convincing" standard applicable to defamation claims adds an additional weight to any plaintiff's

usual "preponderance of the evidence" burden. *Id.* at 615, 643 *A*.2d 1012. It does not, however, obliterate the ordinary manner of weighing motions for summary judgment entirely. Instead, it calls for an analysis of the facts in the record, together with the inferences most favorable to the non-moving party, which then are tested against the clear and convincing standard.

We have described actual malice as a "subjective standard," *ibid.* (citing *St. Amant v. Thompson,* 390 *U.S.* 727, 731, 88 *S.Ct.* 1323, 1325, 20 *L.Ed.*2d 262, 267 (1968)), and we have equated it with proof that the actor "entertained serious doubts about the truth of the statement or that defendant had a subjective awareness of the story's probable falsity," *ibid.* (citing *Schiavone Constr. Co. v. Time, Inc.,* 847 *F.*2d 1069, 1089 (3d Cir.1988)). Actual malice, therefore, may be proven through the interplay of knowledge and recklessness, but the latter is tested against a standard that requires plaintiffs to demonstrate that the statement was made with a "high degree of awareness of [its] probable falsity." *Garrison v. Louisiana,* 379 *U.S.* 64, 74, 85 *S.Ct.* 209, 216, 13 *L.Ed.*2d 125, 133 (1964).

Contrary to the majority's approach, we have been "wary of disposing of cases involving actual malice through summary judgment" both because of the difficulty facing plaintiffs charged with demonstrating actual malice, and because of the inherent difficulty of proving that defendant acted with the requisite state of mind. *Costello, supra,* 136 *N.J.* at 615, 643 *A.*2d 1012 (citing *Maressa v. N.J. Monthly,* 89 *N.J.* 176, 197 n. 10, 445 *A.*2d 376, *cert. denied,* 459 *U.S.* 907, 103 *S.Ct.* 211, 74 *L.Ed.*2d 169 (1982)). As we have held in the defamation context, "[i]f the recklessness approaches the level of publishing a knowing, calculated falsehood, the decision whether the defendant acted with reckless disregard for the truth should be submitted to the jury." *Maressa, supra,* 89 *N.J.* at 200, 445 *A.*2d 376.

Notwithstanding this admonition that the clear and convincing standard of proof be tempered by a recognition at the summary judgment stage of the inherent difficulties of proving actual mal-

ice, the majority's approach reveals two analytical errors. First, in its review and recitation of the facts, the majority has implicitly accepted as true all of the facts and inferences most favorable to the moving party, rather than affording the non-moving parties the benefit of the inferences favorable to them as is ordinarily the case.

Second, the majority compounds that remarkable error in analysis by overlooking the many pronouncements from this Court and the United States Supreme Court that would demand an entirely different method of weighing the adequacy of plaintiffs' evidence relating to actual malice. Because we have recognized that, in the defamation context, direct evidence generally will not be available to plaintiffs, we have embraced an understanding of the actual malice test that would permit reliance on a variety of proofs. *See Costello, supra,* 136 *N.J.* at 615, 643 *A.2d* 1012. Those include the existence of "obvious reasons to doubt the veracity of the ... accuracy of [the] reports," *ibid.* (quoting *St. Amant, supra,* 390 *U.S.* at 732, 88 *S.Ct.* at 1326, 20 *L.Ed.*2d at 268), "internal inconsistencies or apparently reliable information that contradicted the story's libelous assertions," *ibid.* (citing *Curtis Publ'g Co. v. Butts,* 388 *U.S.* 130, 161 n. 23, 87 *S.Ct.* 1975, 1995 n. 23, 18 *L.Ed.*2d 1094, 1115 n. 23 (1967)), and "a failure to pursue the most obvious available sources for corroboration," *ibid.*

Likewise, in the context of a traditional defamation claim, we have commented that the "bald assertion by the publisher that he believes in the truth of the statement may not be sufficient." *Dairy Stores, Inc. v. Sentinel Publ'g Co.,* 104 *N.J.* 125, 150, 516 *A.2d* 220 (1986). Indeed, we have been careful to caution that in spite of the "publisher's denial that it had serious doubts about the truthfulness of the statement, other facts might support an inference that the publisher harbored such doubts." *Ibid.* Therefore, neither the court when faced with a motion for summary judgment nor the jury at trial is required to believe a defendant's statement professing innocence. Instead, the court, or the jury, must determine from all of the facts and circumstances whether the publica-

tion was reckless. *Ibid.* (citing *St. Amant, supra,* 390 *U.S.* at 732, 88 *S.Ct.* at 1326, 20 *L.Ed.*2d at 267).

Fairly recited in accordance with these precedents and in light of the inferences to which plaintiffs are entitled, it should be clear that the majority, and the appellate panel, have erred. There is no doubt that the use of the word "arrested" in the teaser headline was false and defamatory. That word choice was made in the context of an original article that included both an accurate headline and two references in its body that made it clear that plaintiffs had been sued in a civil proceeding. It was a choice Milo made even though he conceded that he knew the difference between a civil and a criminal proceeding and knew the difference between being accused, being charged, and being arrested. Armed with that knowledge, he made several choices that formed the basis for plaintiffs' complaint.

Having read the accurate article only a day earlier, he chose the inaccurate word "arrested" to describe what had happened to plaintiffs. He chose that word when putting together a teaser headline slated to be placed on the front page and in large headline format. He decided to substitute the false word arrested for the accurate ones in the context of a promotional edition of the newspaper that he knew would have a circulation reaching well beyond the newspaper's regular readership. Moreover, in preparing the article so that it would fit into the allotted space, he made no effort to ensure that it was accurate, instead opting to merely cut off the original article's last three paragraphs. In making that choice, he deleted the part of the article that had reiterated that the SEC complaint was a civil proceeding.

Plaintiffs relied on additional evidence relevant to malice as well. As they pointed out, the newspaper's publisher not only considered the matter to be sufficiently serious that Milo was disciplined, but she testified about the standard to which he should have adhered. According to the publisher, Milo should have "[d]ouble-, triple-check[ed]" the accuracy of his choice of words and could have consulted with counsel before substituting the

word he chose. Moreover, Milo himself conceded under oath that he might have had a doubt about the accuracy of the teaser. Although it is true that he changed the answer to the question about his thinking during the second half of his deposition following a luncheon with his attorney and presented a different recollection in the certification he filed in support of the motion for summary judgment, in the context of this dispute, those facts raised credibility questions that the jury, rather than the court, should have resolved. On balance, there was enough evidence from which a jury could have concluded, using the clear and convincing standard, that Milo acted with reckless disregard for the truth or falsity of the headline. That evidence was sufficient to withstand summary judgment.

Faced with these facts, the majority offers little more in support of its conclusion than a series of excuses. Milo was harried, he was busy, he was under pressure of a deadline, he had many responsibilities, the list goes on. Adding to those excuses an explanation that amounts to a finding on credibility, the majority places great weight on Milo's ever-better version of what he knew or thought when he wrote the inaccurate teaser, essentially concluding that his post-luncheon clarification about what he meant when he conceded that he was aware that the teaser was possibly false, represented the truth.

In spite of the clear pronouncements from this Court and the United States Supreme Court about the way in which evidence of actual malice must be evaluated, the majority, sounding more like apologists for editing and writing that even they denounce as shoddy, sloppy, and careless, *ante* at 240, 254–55, 255, 37 *A.*3d at 452, 461, 461, nonetheless are content to conclude that the evidence falls so far short of the proofs needed to meet the actual malice standard that plaintiffs should be deprived of their day in court. In and of itself that is a remarkable approach that is inappropriate in the context of a defamation claim; applied to the facts and accorded the inferences that our longstanding jurisprudence would demand, it calls forth this dissent.

To be sure, the standard imposed by the interrelationship between the actual malice and clear and convincing standards is one that places a significant burden on plaintiffs, but courts must take care to afford plaintiffs all reasonable inferences that flow from the evidence they can muster lest meritorious matters be prevented from reaching the jury. More to the point, in light of that heavy burden, courts should be wary of fixing the bar so high that it becomes an impossible burden. In weighing and evaluating that evidence, this Court should be careful not to confuse its view of whether the evidence is indeed clear and convincing with an analysis of whether plaintiffs have offered sufficient evidence of actual malice that, if believed by a jury, would meet that high standard.

This record amply illustrates the difference. The trial court, the appellate panel, and now a majority of this Court, found the evidence offered by defendant that Milo was "busy" and "under time pressure" to be significant and found that his increasingly strong articulations of his belief that his teaser was not inaccurate to be persuasive. But a jury might conclude that "I was busy" was merely an excuse for a reckless choice. A jury might find that Milo's original concessions while being deposed that it was a "mistake" to use the word arrested, that he could not recall whether he believed that it was true, and that he might have had doubts about the accuracy of the headline were candid and unrehearsed, and therefore were the truth, while his post-luncheon change of heart on that subject is merely self-serving or lacking in credibility. Those, however, are decisions for the jury to make and to the extent that the trial court, the appellate panel, or even this Court, weighed them in favor of defendants, they failed to afford plaintiffs the benefit of the inferences to which they were entitled in the context of a summary judgment motion.

## III.

I dissent for a third and final reason as well. In its broad and forgiving embrace of journalistic practices it candidly denounces

as being sloppy, *ante* at 240, 37 *A*.3d at 452, shoddy, *id.* at 255, 37 *A*.3d at 461, "undoubtedly careless" *id.* at 254, 37 *A*.3d at 461, and "needlessly do[ing] harm to a person's reputation," *id.* at 257, 37 *A*.3d at 462, the majority treads perilously close to creating a new standard.

In relevant part, the record reflects that Milo explained the busy and hectic nature of his job, focusing in particular on the days leading up to the printing deadline. He asserted that he could not remember why he used the word "arrested" in the front-page teaser but offered his opinion in a certification, given in support for his employer's summary judgment motion, that "[t]here is no real difference in the news value" as between that word and the word "accused" that had been used in the original article's headline. In the same certification, he asserted that when he "wrote the headline [he] harbored no doubts that what [he] had written was true and correct."

In reviewing the evidence in the record, the majority creates a rather strange approach to defamation, essentially concluding that if in the midst of a deposition, and following consultation with a lawyer, one simply denies having any idea that the writing was false, or offers an opinion that the false word had equivalent journalistic weight to the truth, any defamation claim can be defeated. The majority ignores the likelihood that Milo's initial concession was true and his subsequent, entirely different asser-tion was false, deeming the matter of Milo's credibility to be too thin to merit consideration by a jury.

And yet, there are clear indicia that Milo's subsequent state-ments were not true. First, with each iteration, Milo became more certain that he had no idea that there was a difference between being accused or charged in a civil complaint and being arrested. Second, in his final version of his recollection, found in his certification, he utilized language drawn from judicial opinions on defamation. He referred to "harboring no doubt," a curious

and stilted phrasing indeed, and one that can only have come from an attorney familiar with the language of our case law. Third, Milo had every incentive in the world to change his story from his candid concession that it was possible that he had a doubt about the veracity to some other version of the truth; not only his job, but the fortunes of his newspaper's owners were on the line.

Although the majority's opinion includes broadsides that should make defendant cringe, see ante at 240, 254–55, 255, 257, 37 A.3d at 452, 461, 461, 462–63, and even quotes this Court's previous admonitions that "shoddy and careless reporting that leads to the dissemination of false or misleading information is detrimental to the enlightenment of a free society," id. at 257, 37 A.3d at 462 (quoting Costello, supra, 136 N.J. at 620, 643 A.2d 1012), simply using those words is no substitute for faithfully applying the law that has long governed the press when it prints falsehoods that defame people.

In rejecting the arguments that plaintiffs' evidence suffices to withstand summary judgment, today's majority opinion creates a new approach, one that will completely shield a newspaper if the author or editor responsible for publishing the defamatory false-hood simply has the presence of mind to say what amounts to magic words. Any author who says he was busy, or pressured, or overworked and trying to meet a weekly deadline, and any witness well-coached enough to parrot the catchphrase of "harboring no doubt" will find a safe harbor regardless of the falsehoods that have been published. In concluding that plaintiffs are not entitled to present their proofs to a jury, the Court today moves the already considerable bar that a defamed plaintiff must overcome ever higher, with the likely consequence that sloppy and unprofessional journalistic practices will become the norm.

Because the majority's analysis of the law and recitation of the facts are flawed, and because it can only serve to embolden the very kind of sloppy, careless journalistic practice that led to the

publication of this plainly defamatory statement on the newspaper's front page, I dissent.

*For affirmance*—Chief Justice RABNER and Justices LONG, ALBIN and PATTERSON and Judge WEFING (temporarily assigned)—5.

*For reversal*—Justices LaVECCHIA and HOENS—2.